**TRICE v. LANCASTER et al.**

No. 28794.

St. Louis Court of Appeals.

Missouri.

July 20, 1954.

Rehearing Denied Sept. 10, 1954.

Donald S. Siegel, St. Louis, for appellant.

Thompson, Mitchell, Thompson & Douglas, Harold I. Elbert, St. Louis, for respondents.

HOUSER, Commissioner.

This is an action in three counts for actual and punitive damages for slander brought by Leo Trice against Atlanta Life Insurance Company, a corporation, and O. L. Lancaster, Sr., its branch office manager. Tried to a jury a verdict for plaintiff and against both defendants on all counts in the total sum of $3,550 was returned. Following the entry of judgment upon the verdict the trial court sustained defendants' motion for judgment in accordance with their motions for directed verdict, and entered judgment for defendants on all counts. Plaintiff has appealed from the latter judgment.

The petition alleged that the individual defendant made certain slanderous statements concerning plaintiff, an insurance salesman and collecting agent formerly employed by the corporate defendant, charging him with the crime of embezzlement in taking certain premium payments which he had collected and which belonged to defendant company. The answer pleaded a general denial, or in the alternative the truth of the statements, and as a second alternative the defense of qualified privilege in that the statements, if made, were made without malice or ill will to policyholders of the company during an investigation of the accounts of plaintiff. The defendant company admitted that at any time Lancaster may have spoken to the three persons to whom the publications were allegedly made, he was acting as general manager and agent of defendant in defendant's business "and that all of his actions were within the scope of his employment and in the actual performance of his duties for defendant."

Plaintiff was employed by the corporate defendant to sell insurance and collect premiums from policyholders. The premiums were ordinarily paid quarterly and varied in amount from $4.86 to $57. Upon collection of a premium plaintiff would issue to the policyholder a company form called a "Collection Acknowledgment" which contained the following printed matter: "Each agent must make report at close of each day of results obtained on field the previous day." Premiums were reported to the company on a form entitled "Agent's Daily Re-

port" on which were reported the date, name of the policyholder, policy number, due date of the premium, amount of the premium, date the premium was paid to the agent, etc. Plaintiff salesman's contract with the company provided:

"17. The Salesman shall keep true accounts of the business done by himself in the books and on the forms provided by the Company.

"18. The Salesman agrees to keep separate and distinct all moneys belonging to the Company and to pay over immediately to the Company all collections made in its behalf, in no case making personal use of such funds."

Between January 1 and October 11, 1950, plaintiff made between 1000 and 1500 collections. It was agreed at the trial that in 58 instances the collection acknowledgments given to policyholders and plaintiff's daily reports showed that he collected premiums seven to ten days before they were reported to the company. In each instance plaintiff had made several reports between the day the premium was actually collected and the day it was reported to the company. As an example: Plaintiff collected three premiums of $12.07 each from George and V. Rembert on September 12, 1950. One of the premiums was reported to the company on October 11 as having been collected on October 6. The other two premiums were reported on September 26 as having been collected on September 25. Plaintiff made several reports to the company between September 12 and the date these payments were reported to the company.

According to plaintiff the 58 payments were not reported as soon as they were collected for the reason that there was a financing plan, in fact two financing plans, in operation in the office. In many instances the policyholder would not have enough cash on hand to pay the premium by the expiration of the grace period. In such cases, according to plaintiff, Lancaster instructed the agent to follow the practice of financing the payment of the premium out of his own pocket, drawing in advance on his salary by voucher. Under the second financing plan, if an agent did not have the money with which to finance a case he was instructed by Lancaster to go out and collect an advance premium on a policy on which the grace period was not about to expire and apply the premium to a policy that was about to lapse. When the latter policyholder paid his premium plaintiff would use the money for the payment of the premium of the first policyholder. The object was to "save a lapse, because he (Lancaster) was very strict and hard about lapses and also about delivered business." Some of the policyholders paid their premiums under a part payment plan but agents were not allowed to turn in the part payment to the office until the full amount of the premium was collected. Other agents as well as Lancaster followed this practice of applying advance premiums to prevent policies from lapsing and to deliver policies. Lancaster had shown plaintiff three or four agent report books in Lancaster's desk in which were listed premiums that Lancaster had collected but not reported. Lancaster kept agents' daily reports in his desk, to be reported later. Lancaster gave the office girl who answered the telephone a list so that if a policyholder whose money had been used in this manner called in answer to a form letter sent to those whose premiums had not been reported he could be informed that the premium had been paid and that a receipt would be issued in a few days. Plaintiff received a letter from defendant company signed by Lancaster on October 5, 1950 advising him that his services with the company were suspended pending further audit of his debit. It was during the investigation of the audit that the allegedly slanderous statements were made by Lancaster.

Plaintiff made a report to the company on October 5, which was the day before he received the letter of suspension. On October 7 plaintiff reported $116.93 in premiums which he had collected before October 5. One of these collections, a premium in the sum of $57, was collected September 22. When he made the October 7 report plaintiff requested and was given permission to

collect premiums from policyholders whom he had arranged to see before receipt of the letter of suspension. On October 9 plaintiff made written application to Monsanto Credit Union for a loan of $350. The application for the loan recited that the purpose of the loan was to pay for dental work, coal, clothing and on account of a death in the family. The application was approved and the loan was made to plaintiff on October 11. On the same day, October 11, plaintiff reported to and paid the insurance company $185.06, of which $132.70 had been collected by plaintiff prior to October 7. One of the items of the remittance of October 11 was a payment which was actually collected by plaintiff on July 11, 1950, exactly three months previously. On interrogatories plaintiff denied that he had made a loan between October 1 and October 15 to pay back premiums to the insurance company. In answer to another question he denied that he had made a loan for any purpose between those dates. These denials were made before plaintiff knew that defendants were informed of the loan. After he learned that defendants were so informed his explanation of his previous denials was that he thought that the question was whether he had made a loan to repay premiums, and that the loan was not for that purpose. Plaintiff testified that the application for the loan was made before he was suspended, but the facts show that plaintiff learned of the suspension on October 6 and made the application for the loan on October 9.

There is no contention on this appeal that the statements attributed to Lancaster charging plaintiff with embezzlement of company funds were not slanderous in nature. Consequently, we need not review the evidence in connection therewith.

Defendants' evidence supported the theory that although Lancaster, in the course of his audit of plaintiff's debit, talked to each of the three persons to whom the slanderous statements were allegedly published, he did not tell them that plaintiff had taken any of the company's money, but merely told them that he was temporarily suspended on account of "some financial irregularities," and that during the audit of plaintiff's accounts being conducted to determine the total irregularities the policyholder should not pay premiums to plaintiff. He further denied any knowledge of the practice of reporting premium payments in the manner testified to by plaintiff.

The trial court assigned the following reasons for sustaining defendants' after-trial motions: (1) that plaintiff's evidence shows that the slanderous statements were true and that plaintiff was guilty of the charges; (2) that plaintiff's evidence showed that his actions violated Section 375.290 RSMo 1949, V.A.M.S., which provides as follows:

"1. Any person who shall be appointed, or who shall act as agent for any insurance company within this state, or who shall, as such agent, solicit applications, deliver policies or renewal receipts and collect premiums thereon, or who shall receive or collect moneys from any source or on any account whatsoever, as such agent, for any insurance company doing business in this state, such person shall be held responsible in a trust or fiduciary capacity to such company for any money so collected or received by him for such company.

"2. Any such agent or person who shall embezzle or convert to his own use, or shall take or secrete or otherwise dispose of with intent to embezzle or use, or who shall fraudulently withhold or appropriate, invest or make use of without the consent of such company, or contrary to its instructions, any money belonging to such company which shall have come into his possession, or shall be under his care by reason of such agencies, he shall be deemed by so doing to be guilty of a crime, and, upon conviction thereof, shall be punished in the manner prescribed by law for stealing property of the value of the money so embezzled, converted, taken, used or secreted";

(3) that the method of collecting advance premiums from one policyholder and using the money thus collected to pay the premium for another policyholder whose policy is about to lapse, testified to by plaintiff as a justification for his action in withholding premiums, is contrary to public policy; and (4) that the method of collecting above set forth is contrary to the rules of the life insurance company which rules could not be waived by the branch manager.

The court stated in its order that if these rulings should be erroneous the court sustained defendants' motion for a new trial for error in the giving of instructions for plaintiff and refusal of an instruction requested by defendants, and that the verdict was excessive and that the court would order a remittitur of a total of $1,500.

Plaintiff contends that the trial court erred in sustaining defendants' after-trial motions and in entering judgment for defendants. In his ruling the trial judge declared as a matter of law that the application of the premiums collected on policies not about to lapse to the payment of unpaid premiums on policies which were about to lapse constituted a misapplication or taking of company funds in violation of § 375.290, supra; that the practice was in excess of Lancaster's real or apparent authority; and that the practice was known by plaintiff to be beyond Lancaster's authority. Plaintiff assails the ruling on the ground that Lancaster, as general or branch manager, could and did authorize the practice of applying advance premiums to policies about to lapse, and that regardless of Lancaster's actual authority plaintiff was entitled to rely in good faith upon Lancaster's right to authorize the practice.

■ If the company, with full knowledge of the "financing plan" or practice of applying the payment of a premium by Policyholder A to the credit of Policyholder B, encouraged, condoned, or ratified plaintiff's acts, plaintiff could not be guilty of a violation of § 375.290, supra, which requires that the act be done without the consent of the company. Parenthetically, we should say that the converse does not necessarily follow, namely, that plaintiff's acts would constitute a violation if not known to the company.

■ The company is to be held to have consented if it is bound by the knowledge of Lancaster who, according to plaintiff and his witness Jules Arthur, encouraged plaintiff, indeed instructed him, to engage in the practice. If the company is not bound by the knowledge of Lancaster, it is not to be held to have consented, unless it can be said that Lancaster, as a general or branch manager, had authority to waive the rule of the company concerning the prompt reporting of premiums. While a corporation ordinarily is bound by the knowledge of its agents, 19 C.J.S., Corporations, § 1078, pages 613, 614; Griffith v. Supreme Council of Royal Arcanum, 182 Mo.App. 644, 166 S.W. 324, the agent's knowledge of his own unauthorized act, not brought home to the authorized corporate board, officer or agent, cannot be imputed to the corporation. Scrivner v. American Car & Foundry Co., 330 Mo. 408, 50 S.W.2d 1001. Nor is the agent's knowledge imputable to the corporation when it concerns a fact which the agent is interested in concealing from the corporation, and where the circumstances are such that it will be presumed that he will not communicate his knowledge to the corporation. Kenneth Inv. Co. v. National Bank of Republic, 96 Mo.App. 125, 70 S.W. 173; 19 C.J.S., Corporations, § 1084, pages 621–622. The unauthorized practice described by plaintiff, as we shall see infra, was adverse to the interests of the company. It was to the interest of the company that the reports reflect the truth with respect to the payment of premiums and that the premiums collected be reported and remitted promptly. On the other hand, it was to the interest of both plaintiff and Lancaster to maintain a high level of insurance in force and cut down the lapse ratio. Where the policyholder had good credit but was slow in making his payments his policy could be kept in force by applying to his account the premiums paid by another policyholder. While this practice constituted a violation

of the company rules it enured to the advantage of the collecting agent and the branch manager. That Lancaster would conceal and not reveal to the company his knowledge of a practice so violative of company policy and inimicable to its interests is evident, and as a consequence Lancaster's knowledge of the practice may not be imputed to the company.

■ The next question is whether Lancaster, as general or branch manager, could waive the rules of the company. A general manager has broad authority. He may do any act on behalf of the corporation which is usual and necessary in the ordinary and customary business of the corporation. James H. Forbes Tea & Coffee Co. v. Baltimore Bank, 345 Mo. 1151, 139 S.W.2d 507; Continental Assur. Co. v. Van Cleve Bldg. & Const. Co., Mo.App., 260 S.W.2d 319; 19 C.J.S., Corporations, § 1002, page 470; 2 Fletcher Cyclopedia, Corporations, 1954 Revised Volume, § 667, pp. 854–868. He may not, however, under the doctrine of implied or apparent authority enter into "unusual, extraordinary, or unnecessary contracts (of employment), if fraud or imposition upon the employer is shown," 2 Fletcher Cyclopedia, Corporations, 1954 Revised Volume, § 673, pp. 882–885, nor engage in unusual or extraordinary business practices not customarily recognized in the industry, and adverse to the interests of the corporation. Furthermore, where the person dealing with the general manager has knowledge of special limitations and restrictions upon his authority, or knowledge of facts which put him on inquiry with respect thereto, the doctrine is inapplicable. Metropolitan Life Ins. Co. v. Henderson, 9 Cir., 92 F.2d 891. From the record in this case it may be said as a matter of law that Lancaster had no authority, express or implied, to waive the rules of the company; that plaintiff knew or had reason to inquire with respect to the limitations on Lancaster's authority; and that a waiver of the rule would have constituted an imposition, and might well have resulted in the perpetration of a fraud, upon the company. Under these circumstances plaintiff may not rely upon waiver of the company rules in justification of his violation thereof.

■ Plaintiff argues, however, that his employment contract provided that he was to conform to and abide by any instructions or regulations which might be issued from time to time by the manager, and that a part of Lancaster's duties was the training and instruction of salesmen as to what they should or should not do in connection with their work as agents for the company. The contract, however, does not provide that the manager has power to waive the rules of the company. It obligates plaintiff to keep true accounts and immediately turn over to the company all collections made. Furthermore, the contract provided that its contractual provisions could be waived only by written memorandum expressing such waiver, duly signed by the president or secretary of the company. The contract thus provides no basis for the authority of Lancaster to waive the company rules.

■ Defendants seek to support the ruling of the trial judge on the theory that by plaintiff's own testimony he convicts himself of embezzlement within the meaning of § 375.290, supra. We cannot say as a matter of law from plaintiff's testimony that he "fraudulently," that is, knowingly and purposely, Mansur v. Lentz, 201 Mo. App. 256, 211 S.W. 97, withheld, appropriated or made use of company funds with the criminal intent to commit an embezzlement. The insurance company was not deprived of the money collected from Policyholder A when it was turned in to the credit of Policyholder B. It could reasonably be said that the intent of plaintiff in pursuing the practice was an intent to pay the money to the company, and not to deprive the company of said funds. True enough, he paid the collection to the company in a different character from that in which he received it. Concededly he wrongfully *misapplied* the funds, in that he misrepresented the *source* of the funds, and gave credit for the payment to the wrong person. As a trustee, acting in a fiduciary capacity, it was his

duty faithfully and truthfully to report the payment of the premium to the company and credit the payment by Policyholder A to the credit of Policyholder A. Under his contract it was his duty to remit the collection to the company "immediately." Under company rules it was his duty to report the payment the day after it was collected. It is evident that in pursuing the practice to which he testified he was acting improperly and wrongfully, and adversely to the interests of the company. By falsely reporting the payment of a premium by Policyholder B when the payment was actually made by Policyholder A, the company could be exposed to double claims and expensive litigation in case of the death of A and B in the interim before B paid and before A's payment was reported. While the practice was reprehensible and constituted the falsification of records in such a manner as to make possible the defrauding of the company, it did not in and of itself, and without other and further facts, constitute embezzlement. The words "withhold," "appropriate" and "make use of", as employed in the statute, imply the exercise of dominion over the funds of the insurance company in a manner inconsistent with the company's title thereto and calculated to deprive the company of its funds. It was not the intention of the General Assembly, in enacting § 375.290, supra, to cover a situation where the collecting agent reports and remits all collections to the company, and where the agent's dereliction consists solely of falsely representing the identity of the persons from whom the collections are made.

 It is equally evident that if plaintiff exercised dominion over funds collected from policyholders, and used the money for his own personal purposes, he would be guilty of embezzlement notwithstanding he later paid all amounts due the company. The exercise of dominion over the funds collected could be shown in a number of different ways. The mere passage of time, if sufficiently long, might in and of itself give rise to an inference that the collector had devoted his collections to his own personal uses and purposes. It is

the intent to deprive the company of the funds and to convert them to the agent's own use that makes embezzlement out of withholding. How much time must elapse between the collection and the remittance in order for the inference of conversion to arise is a question for the determination of the jury. Evidence that after collection, but before remittance, the agent could not promptly comply with the demand for the amounts collected would be evidence of the exercise of dominion over and the conversion of the funds. In the case at bar there was evidence of retention of the collections in varying periods of from seven days to three months before remittance to the company. In addition to the passage of time, the fact that upon suspension plaintiff, within three days, applied for a loan and discharged his debt to the company on the same day he received the proceeds of the loan, constituted evidence of the exercise of dominion over the funds from which the jury properly could draw the inference that the moneys borrowed were used for reimbursement of plaintiff's arrearages and that plaintiff knowingly and intentionally had withheld, appropriated or made use of company funds without the consent of the company. The drawing of the inference, however, was not for the court, to be ruled as a matter of law, but was a matter within the province of the jury under proper instructions. Consequently the court fell into error in sustaining the defendants' after-trial motions and rendering judgment for defendants.

 Plaintiff's next point is that the trial court erred in sustaining defendants' motions for a new trial because of the giving of Instruction 11 and refusing Instruction A. By 11 the jury was instructed that "malice does not consist alone in a personal spite or ill-will, but exists in law, wherever a wrongful act is intentionally done without just cause or excuse." By A the jury was instructed that the term "express malice" means that the statements "must have been actuated by motives of spite, ill will or a malicious purpose to do an injury to the plaintiff." It is urged that 11 permitted recovery on legal malice whereas plaintiff was obliged to show actual malice in order

to recover, since qualified privilege was an issue. Plaintiff's Instruction 2 in Boehm v. Western Leather Clothing Co., Mo.App., 161 S.W.2d 710, identical in terms with 11, was approved as a correct definition of actual malice, in a case in which the question of qualified privilege was an issue. Reaffirming our ruling therein, we hold that defendants were not prejudiced by the giving of 11, and having properly declared the law in 11 it was not error to refuse A. Spears v. Schantz, Mo.App., 246 S.W.2d 399.

The next question is whether the court erred in giving plaintiff's Instruction 14A which follows:

"The Court instructs the jury that the mere belief in the truth of a defamatory and false statement, even if defendants have probable cause for such belief, does not constitute a justification or defense, and the jury is further instructed that even though the belief may have been induced by misconduct on the part of the plaintiff, if such misconduct falls short of what you may find and believe from the evidence defendants have charged plaintiff, it is not a defense."

Defendants claim that 14A conflicts with Instructions 8, 9 and 10 which submitted the issue of qualified privilege and which read in part as follows:

"* * * if you further find and believe from the evidence that plaintiff had not reported premiums promptly, or that he had withheld premiums for any reason, if you so find, if you further find and believe from the evidence that any statements made to ———— were made in an investigation of plaintiff's debit or in the collection of premiums from ———— or in the collection of premiums on plaintiff's debit, if you so find, and if you further find and believe from the evidence that said statements were made in good faith, without express malice as defined by these instructions and with reasonable or probable grounds for believing them to be

true * * * then your verdict shall be for defendants."

Plaintiff claims that 14A properly declares the law as a cautionary instruction given in connection with defendants' Instructions 12, 13 and 14 which instruct the jury on the defense of truth; further, that defendants did not make a submissible case of qualified privilege and therefore were not entitled to 8, 9 and 10; that the privilege arising out of the right to investigate the audit did not entitle Lancaster to use language of a defamatory character not warranted by the occasion which prompted the publication; that the defense of qualified privilege is in the nature of a plea of confession and avoidance but that defendants are not entitled to the defense for the reason that they did not admit the making of the utterance but expressly denied the same; and finally that 14A must be read and considered together with the other instructions and when so considered no conflict appears.

It is true that 14A, considered alone in connection with 12, 13 and 14 on the defense of truth, was proper, and if the application of 14A had been in terms limited to 12, 13 and 14, it would not have been subject to criticism. There was, however, no such restriction or limitation, and the jury could have considered it in connection with 8, 9 and 10. When so considered there is a definite conflict for the reason that 14A nullifies and tends to exclude the question of qualified privilege from the consideration of the jury. It declares that belief in good faith in the truth of the false statement does not constitute a justification or defense, while 8, 9 and 10 declare that if the statements were made in good faith and in the belief that they were true, the defendants shall prevail. For this error the trial court correctly granted defendants a new trial.

 Appellant asserts, however, that 14A is merely an abstract statement of the law and that the giving of such an instruction is rarely held to be reversible error unless it appears that the instruction was confusing, misleading and prejudicial in the

particular case. While this is true, it is evident that confusion might arise in an attempt to reconcile 14A with 8, 9 and 10. Whether such confusion may have entered into the minds of the jury becomes a question of discretion, and when a matter of discretion arises an appellate court is likely to affirm whatever action the trial court may have taken. Since the trial judge, who had the best opportunity to determine the effect of any error, in the exercise of his discretion found that 14A was prejudicial, we will defer to and not reverse his ruling on appeal, it not appearing that the ruling was clearly erroneous or that it constituted an abuse of discretion. Rea v. Feeback, Mo.Sup., 244 S.W.2d 1017; Tennison v. St. Louis-San Francisco Ry. Co., Mo.Sup., 228 S.W.2d 718; Rasp v. Baumbach, Mo.Sup., 223 S.W.2d 472.

But appellant says that defendants did not make a submissible case on qualified privilege and were not entitled to instruct the jury on this question. He says the record is completely devoid of any evidence that the slanderous statements were made in good faith and that Lancaster believed them to be true. In support of this statement he asserts that Lancaster denied in detail that he made any of the slanderous statements upon which the three causes of action were based. In a deposition which was used at the trial Lancaster, on cross-examination, and in answer to a question about shortages or theft of money by plaintiff, said:

"I wouldn't term it as theft, because it was not theft. I would term it as being irregular in reporting the money, and I don't want to infer or even have you think that was the way I thought of it. If we did, we would have taken a different course. There was no theft involved or even suspected.

"I notice in your petition you said embezzlement. There is none of that suspicion and not even thought of by me or the home office."

Appellant relies on the ruling in Perdue v. Montgomery Ward & Co., 341 Mo. 252, 107 S.W.2d 12, that if the person accused of slander had no thought in his mind that plaintiff had committed a theft but notwithstanding charged that plaintiff was a thief, there can be no good faith on his part in so charging and that absent good faith there can be no question of privilege. This point would be challenging if the theory of the defense were consistent with Lancaster's statements in the deposition. One of the defenses pleaded and sought to be proved, however, was that of the truth of the charge of embezzlement—that appellant was guilty of taking company money and was short and although the facts elicited in the above cross-examination, having occurred in the taking of a deposition, were admissible not only for impeachment purposes but also were admissible as substantive evidence, Pulitzer v. Chapman, 337 Mo. 298, 85 S.W.2d 400, the jury was not concluded thereby, so as to deprive defendants of their right to submit the defense of qualified privilege. The jury could have disbelieved Lancaster's statements in the deposition and yet believed, from all of the evidence, that the slanderous statements were made and were made by him in good faith and in the belief that they were true.

Defendants were entitled to assert the defense of qualified privilege. Having received complaints from policyholders, and having learned that plaintiff was not reporting premiums promptly, Lancaster had a direct interest in ascertaining the facts, and his communications to interested policyholders, if made in good faith, without express malice and with probable grounds for belief, in the course of an investigation of plaintiff's debit, for the protection of his company's and his own interests, could be found qualifiedly privileged.

The next question is whether the express denial by Lancaster of the utterances attributed to him deprived defendants of the defense of qualified privilege. While a plea of privilege is, in its nature, a plea of confession and avoidance, Reese v. Fife, Mo.Sup., 279 S.W. 415; Hall v. Martindale, Mo.App., 166 S.W.2d 594; Hoeffner v. Western Leather Clothing Co., Mo. App., 161 S.W.2d 722; Sitts v. Daniel, Mo. App., 284 S.W. 857, "It is not absolutely

necessary that defendant admit all the words charged in order to plead a qualified privilege; it is * * * sufficient that the plea admit enough of the words to give plaintiff credit for having an apparent right or cause of action. Also it is not required that the admission be without qualification; a hypothetical defense that the words, if published, were published under certain specific circumstances rendering them privileged is good." 53 C.J.S., Libel and Slander, § 178, pages 281, 282. Defendants under the pleadings and evidence were entitled to submit the defense of qualified privilege in a conditional, or hypothetical, form.

Plaintiff finally argues that the defendants were not entitled to the defense of truth, on the same ground, but the law is well settled that a denial in a slander action that the words charged were spoken and a plea that the words spoken are true may be joined in the same answer, for the reason that they are not inconsistent. It does not necessarily follow that defendants spoke the alleged slanderous words because of the plea that they are true. Nelson v. Brodhack, 44 Mo. 596; Wood v. Hilbish, 23 Mo. App. 389; Nelson v. Wallace, 48 Mo.App. 193. See Annotation 21 A.L.R.2d 813.

On account of the error in the giving of Instruction 14A the ruling of the trial court sustaining defendants' motion for a new trial was correct. This eliminates any necessity for considering the action of the court in connection with remittitur.

For the reasons stated the judgment of the trial court should be reversed and the cause remanded for a new trial, and the Commissioner so recommends.

PER CURIAM.

The foregoing opinion of HOUSER, C., is adopted as the opinion of the Court.

The judgment of the circuit court is, accordingly, reversed and the cause remanded for a new trial.

RUDDY, Acting P. J., BENNICK, J., and HOLMAN, Special Judge, concur.