Saundra WEAVER, Respondent,

v.

AFRICAN METHODIST EPISCOPAL CHURCH, INC., Board of Incorporators of African Methodist Episcopal Church, Vernon Byrd, and Prince Albert Williams, Appellants.

Nos. WD 58400, WD 58401.

Missouri Court of Appeals, Western District.

March 30, 2001.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 24, 2001.

Application for Transfer Denied Oct. 23, 2001.

Brian Madden, Kansas City, for Appellant.

Walter Simpson, Kansas City, for Respondent.

HOLLINGER, Judge.

This is a case of first impression evaluating the sufficiency of the evidence to support a claim for intentional failure to supervise clergy as established by *Gibson v. Brewer*, 952 S.W.2d 239 (Mo. banc 1997). Saundra Weaver was a minister of Mariah Walker congregation of the African Methodist Episcopal Church (AME) from 1990 until December 1996. Ronald Williams was a pastor of the AME church when Weaver first became interested in the ministry in the late 1980s. Prince Albert Williams (Elder Williams) [1] was an elder in the AME governing hierarchy and supervised a number of Kansas City area congregations and ministers, including Weaver. Vernon R. Byrd was a Bishop of the AME church, who, after June 1996, had within his supervisory responsibility Elder Williams and the congregations and ministers under Elder Williams' direct supervision, including Rev. Weaver. Elder Williams and Bishop Byrd terminated her employment as an AME minister in December 1996.

On June 8, 1998, Rev. Weaver filed a three-count petition against Ronald Williams, Elder Prince Albert Williams, Bishop Vernon Byrd, the AME Church and its Board of incorporators. In her petition, Weaver alleged that as early as the late 1980s, Rev. Ronald Williams sexually harassed her and coerced her to have sexual relations in exchange for his sponsorship and support of her ordination as an AME minister. Rev. Weaver further alleged that she eventually complained to their mutual supervisor, Elder Prince Albert Williams, who said that he would see that the improper conduct stopped. However, she further alleged that Elder Prince Albert Williams used his knowledge of these problems and his supervisory position to begin sexually harassing Weaver coercing her to have sexual relations with him. She alleged that the improper sexual conduct ended in 1993 after she made numerous objections, but that Elder Williams then began attacking her professionally. She alleged that some time in 1996, Elder Williams grabbed and squeezed her breast in the church lobby in view of a number of other ministers. She alleged that later in 1996 she complained of this conduct to Bishop Byrd and asked that she be removed from Elder Williams' supervision. She finally asserted that Bishop Byrd took no corrective action and that she was terminated two months later in retaliation for her complaints.

Rev. Weaver's petition claimed relief under three theories. Count I was denominated "sexual harassment" and included claims against both Rev. Williams and Elder Williams; it also pled respondeat superior liability against AME and sought actual and punitive damages. Count II sought relief under the Missouri Human Rights

---

1. Rev. Ronald Williams and Elder Prince Albert Williams are not related.

Act, § 213.055, RSMo.1986,[2] for discriminatory treatment, including sexual harassment and retaliatory discharge. Count III sounded in negligence and asserted theories of negligent hiring, training supervision, and employment management that allegedly allowed the improper conduct of Rev. Williams and Elder Williams to either occur or go uncorrected. She later filed a First Amended Petition which reasserted Count I and dropped the Missouri Human Rights Act and negligence claims. A new Count II asserted against Bishop Byrd an intentional failure to supervise both Rev. Williams and Elder Williams. A new Count III asserted a similar intentional failure to supervise clergy claim against AME.[3] The trial court subsequently dismissed that portion of the sexual harassment claims under Count I that sought derivative liability against Bishop Byrd and AME and allowed a Second Amended Petition to be filed. This petition repled the allegations of the prior petition in Counts I, II and III and added two additional counts denominated "clergy malpractice" against Rev. Williams and Elder Williams, respectively. It also included a Count VI alleging intentional infliction of emotional distress by all defendants and Count VII alleging retaliatory discharge under a "whistle blowing" theory. Count VII was subsequently voluntarily dismissed.

The record on appeal reflects that Rev. Williams was the only defendant to file an answer to the final petition.[4] Elder Williams filed an answer to the first amended petition which included affirmative defenses and a counterclaim.[5] AME and Bishop Byrd filed motions to dismiss Counts II, III and VI of the second amended petition. On October 21, 1999, the trial court overruled the motions as to Count II and III but ordered Weaver to file an amended Count VI (the intentional infliction of emotional distress claim) containing more specificity. The case proceeded to trial with the pleadings in this posture except for a subsequently filed but never disposed summary judgment motion by Bishop Byrd and AME.

Prior to trial, Weaver apparently settled with Rev. Williams, and the claims against him were dismissed with prejudice. After presentation of all the evidence, the claims were submitted to a jury by means of two verdict directors. Instruction No. 7 submitted a claim of battery against Elder Williams for the 1996 incident where he allegedly grabbed Weaver's breasts. Instruction No. 11 submitted a theory of intentional failure to supervise clergy against AME[6] regarding the acts of Elder Prince Albert Williams. The jury returned

2. All further statutory references are to RSMo.2000, unless otherwise indicated.

3. The count alleged failure to supervise Rev. Williams as well as Elder Williams. This claim was apparently abandoned as the verdict director specifically described failure to supervise only Elder Williams. Although a claim for failure to supervise Rev. Williams would appear to be time barred, there was, interestingly, no affirmative defense of a limitations bar to this court.

4. When AME's failure to file an answer was "discovered" during trial, it was agreed that the case would proceed adding a general denial of all allegations but without any affirmative defenses. Rev. Weaver does not contend, and we do not consider, whether it was necessary for AME to raise the First Amendment issues by affirmative pleading. Clearly the parties tried the case fully cognizant of and attempting to deal with those issues.

5. The counterclaim was subsequently dismissed.

6. The parties agreed that the claims against AME, Bishop Byrd and the Board of Incorporators would be collectively submitted against AME.

a verdict against Elder Williams in the amount of $15,000 actual and $1 million punitive damages. Against the AME defendants, Weaver was awarded $25,000 actual damages and $5 million in punitive damages. All after trial motions were denied except the trial court remitted the punitive damage award against AME to $4 million. This appeal followed.

## THE ISSUES ON APPEAL

The defendants raise both separate and joint issues on appeal. Elder Williams argues separately that the two-year statute of limitations provided in § 516.140 barred the battery claim against him. He asserts the trial court should have therefore granted him judgment not withstanding the verdict. AME separately asserts that Weaver failed to make a submissible case for intentional failure to supervise clergy under *Gibson*, supra. AME also contends that Weaver's claim should have been denied because the trial court had no jurisdiction to decide clergy personnel issues because of the First Amendment of the Constitution of the United States of America. AME also contends that the claim against it should have been denied because it was based on an underlying claim against Elder Williams that was barred by the battery statute of limitations.

AME next argues that it should receive a new trial because the trial court erroneously admitted evidence of AME's sexual harassment policies; AME contends that civil courts have no jurisdiction to determine the meaning and applicability of church doctrine.

Finally, both Elder Williams and AME argue that the punitive damage awards

were excessive and lacked sufficient evidence to be submitted, and that the jury was improperly instructed as to the burden of proof necessary for punitive damages and how to consider such damages when a claim is made against multiple defendants.

We affirm the judgment against Elder Williams. We determine that Weaver failed to make a submissible case against AME under her theory of intentional failure to supervise clergy and thus reverse and direct that the trial court enter judgment in favor of AME. We consider only such issues described above as are necessary to our disposition.

## THE FIRST AMENDMENT AND SUPERVISION OF CLERGY

■ The First Amendment bars government from involving itself in purely ecclesiastic matters, including, but not limited to church doctrine, hiring, firing and retention of church employees and or ministers. *Serbian Eastern Orthodox Diocese for the U.S. and Canada v. Milivojevich*, 426 U.S. 696, 708–11, 96 S.Ct. 2372, 2380–88, 49 L.Ed.2d 151 (1976). Application of this general principle, however, to all factual situations involving civil damage actions between members and the church, employees and the church, and clergy and the church has not been universally defined by the United States Supreme Court nor been unanimously agreed to by state and federal courts considering the issues. Perhaps nowhere has the discussion been as heated and diverse as in the area of sexual misconduct by clergy and the church's legal responsibility, if any.[7] Sexual misconduct claims have arisen in both the contexts of

---

7. John Trevor Wood, "Causes of Action in Missouri Against the Church and Clergy for Sexual Misconduct in Gibson v. Brewer," 65 UMKC L.Rev. 1027 (1997). See also John B. Conder, Annotation, "Liability of Church or Religious Society for Sexual Misconduct of Clergy," 5 ALR5th 530 (1992).

injury to church members by clergy, as well as misconduct directed toward other general church employees and, in this case, misconduct by one member of the clergy toward another. State and federal courts addressing these issues have denied or recognized potential church liability based on diverse theories of liability.[8] The Missouri Supreme Court has rejected all of these theories save two, intentional failure to supervise clergy and intentional infliction of emotional distress, as excessively intruding upon the First Amendment. *Gibson*, supra.[9]

## THE TORT OF INTENTIONAL FAILURE TO SUPERVISE CLERGY

█ In *Gibson v. Brewer*, the Supreme Court determined that "liability for intentional torts can be imposed without excessively delving into religious doctrine, polity and practice." *Gibson*, 952 S.W.2d at 249. Relying upon the principle that the free exercise clause of the First Amendment does not excuse non-compliance with a valid and neutral law of general applicability (citing *Employment Division v. Smith*, 494 U.S. 872, 879, 110 S.Ct. 1595, 1600, 108 L.Ed.2d 876 (1990)), our Supreme Court said the principle also logically applies to intentional torts. *Gibson*, 952 S.W.2d at 248. "Religious conduct intended or certain to cause harm need not be tolerated under the First Amendment." *Id.*

█ A cause of action of intentional failure to supervise clergy has the following constituent elements: (1) a supervisor (or supervisors) exists; (2) the supervisor (or supervisors) knew that harm was certain or substantially certain to result; (3) the supervisor (or supervisors) disregarded this known risk; (4) the supervisor's inaction caused damage, and (5) the other requirements of the Restatement (Second) of Torts, Section 317 are met.[10] *Id.*

## SUFFICIENCY OF THE EVIDENCE OF INTENTIONAL FAILURE TO SUPERVISE

█ In order to make a submissible case on her claim of intentional failure to supervise clergy Rev. Weaver is required to establish by substantial evidence every element essential to liability. *Davis v. Bd. of Ed. of St. Louis*, 963 S.W.2d 679, 684 (Mo.App.1998). Whether evidence is substantial and the inferences drawn from the evidence are reasonable are reviewed *de novo* as they are questions of law. *Jungerman v. City of Raytown*, 925 S.W.2d 202, 204 (Mo. banc 1996). "Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of facts can reasonably decide a case." *Hurlock v. Park Lane Med. Ctr., Inc.*, 709 S.W.2d 872, 880 (Mo.App.1985). Substantial evidence cannot be based on speculation, conjecture and surmise. *Id.* We must "view the evidence in the light most favorable to the plaintiff and give the plaintiff the benefit of all reasonable and favorable inferences to be drawn from the evidence." *Davis*, 963 S.W.2d at 684. We disregard all evidence that does not support the verdict. *Hill ex rel. Hill v. Her-*

8. These theories have included breach of fiduciary duty, respondeat superior/agency, negligent hiring, ordination or retention, negligent failure to supervise, clergy malpractice, negligent and intentional infliction of emotional distress. See fn. above.

9. Although Rev. Weaver alleged a count for intentional infliction of emotional distress,

that count was abandoned and not submitted to the jury.

10. These "other elements" as stated in section 317(a) are that the servant (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or (ii) is using a chattel of the master.

*bert Hoover Boys Club,* 990 S.W.2d 19, 20 (Mo.App.1999).

AME contends that the trial court should have granted its motion for judgment notwithstanding the verdict because Rev. Weaver failed to prove all but one element of the cause of action established by *Gibson* and discussed by this court in *Rhodelander v. Liberty Christian Fellowship,* 6 S.W.3d 402, 406 (Mo.App.1999). AME claims that plaintiff only proved the first element that Elder Williams was under the supervision of AME.

### The Restatement (Second) of Torts § 317(A) Elements

 AME first argues that there was no evidence that it owned the Allen Chapel where the 1996 battery occurred. Rather, it contends, the Allen Chapel property was owned by a separate not for profit Missouri corporation. AME also contends that there was no evidence that any of the sexual misconduct and harassment by Elder Williams some years earlier occurred on any church property. It contends that under *Gibson,* liability cannot be imposed upon it for conduct that occurs at a local church unless it owns the real estate. Rev. Weaver responds that if actual ownership were required then liability could be avoided by holding title to church property in shell corporations. AME relies upon our decision in *Rhodelander.* There, a church secretary sued claiming sexual assault by an associate pastor while she was a patient being treated for depression and a drug overdose in a hospital as well three other later encounters at unspecified locations. *Rhodelander* affirmed summary judgment in favor of the church because of the absence of any evidence that the church knew that the pastor was certain or substantially certain to harm the plaintiff. The court did not discuss or base its holding upon an issue of where the sexual conduct occurred. AME points out that the court described the fifth element as being whether the harm occurred on premises *owned by the church* or while the pastor was using property owned by the church. *Id.* at 406.

 AME's argument fails for two reasons. In *Gibson,* the Supreme Court referred to Restatement (Second) of Torts § 317(a) as describing this element. The Restatement uses the term "possession" not ownership. We have examined the comments to the Restatement, the purposes behind this element and cases interpreting it, and conclude that technical legal ownership of the premises by AME is not required. Moreover, the second clause of § 317(a)(i) disjunctively includes premises "upon which the servant is privileged to enter only as [the master's] servant." It must be kept in mind that a master's duty under § 317 is applicable only when the servant is acting outside the course and scope of his employment. Restatement (Second) of Torts § 317(a) comment a. This may be because the servant is not performing the work of his employer at the time of the act or at the time he commits an intentional tort which, by definition, is not done in his role as the master's agent but rather solely for his own purposes. *Id.* at comment b. The limitations expressed in § 317(a)(i) are intended to restrict the master's liability for a servant's intentional acts outside the course and scope of employment to situations where either the master has some degree of control of the premises where the act occurred or where the master, because of the employment relationship, has placed the servant in a position to obtain access to some premises that are not controlled by the master.

Such limitations serve to restrict the master's liability for a servant's purely personal conduct which has no relationship

to the servant's employment and the master's ability to control the servant's conduct or prevent harm. Thus, in *Hutchison v. Luddy*, 560 Pa. 51, 742 A.2d 1052 (1999), a church was held liable for sexual assault under § 317 where the priest arguably gained access to the teen-age parishioner's hotel room for the purpose of providing counseling. In describing what it called the "privilege clause" of § 317, the court noted that the issue was "how the priest gained access to the room in the first place, i.e., because of his position as a priest or for some other reason." *Id.* at 1060. Moreover, the term "possesses" as used in § 317 includes, we believe, property merely occupied by the master or property which the master has some right to occupy or to control the activity which occurs thereon. Here, the questioned conduct occurred on property technically owned by a congregation of the AME. We do not agree that the location of the conduct was so tenuous to AME's purposes and functioning as to find as a matter of law that this element of the claim was not established. Moreover, we note that AME admits that it, not the local congregation, was Elder Williams' supervisor. It could also be argued that Elder Williams was present at the time because of his position as an Elder of AME and that the possession of the premises element of § 317 was thus established by the privilege clause.

### THE GIBSON ELEMENTS

AME next argues that Rev. Weaver failed to produce any evidence that "it disregarded a known risk to Rev. Weaver by failing to take any action to protect Rev. Weaver." In its next sub-point, AME argues that there was no evidence that AME knew that Elder Williams "was

substantially certain to harm Rev. Weaver as a result of prior complaints." More precisely stated, these arguments address the issue of what knowledge or notice AME had about a risk presented by Elder Williams to which it then failed to respond.

 AME first argues that Bishop Byrd was not even Elder Williams' supervisor at the time of the sexual conduct in 1996 that was the basis for the battery submission against him. If it is AME's position that the only legally sufficient notice or knowledge under *Gibson* is that notice to or knowledge of the wrongdoer's immediate and current supervisor, then we reject that contention. Rev. Weaver argues that she did complain to Bishop Byrd in October 1996. If it is her argument that under *Gibson*, the requirement of knowledge is satisfied by notice to AME after the misconduct, but before some element of damage, then we reject that argument as well for purposes of a cause of action of intentional failure to supervise. The requirement of a supervisor or supervisors expressed in *Gibson*, 952 S.W.2d at 248, is intended to bar church liability where the church as a matter of church government does not provide a supervisor. *Id.* This requirement is intended to prevent the cause of action from running afoul of the First Amendment. There is no apparent reason, and no authority cited by AME, for requiring that the risk be known by or the notice be given only to the immediate supervisor of the wrongdoer.

 There was evidence at trial that Elder Williams had sexually assaulted another church member 20 years ago. However, even Rev. Weaver admits there is no evidence that any church official knew of this incident.[11] Rev. Weaver ar-

---

11. There was some evidence that this church member may have complained to a local pastor, presumably working under Elder Williams. This is, in our view, not sufficient notice to the church as is defined more fully, supra.

gues two other bases for imputation of knowledge to AME. First she argues that she complained to several other ministers of Elder Williams' misconduct. Again, however, this was after the battery by Elder Williams and, as noted before, there was no subsequent sexual assault. There was some evidence that Rev. Weaver complained to another minister about Elder Williams' conduct in the early 1990s. This minister was apparently at the same hierarchical level as Rev. Weaver and there is no evidence the complaint was forwarded to anyone even at the same level as Elder Williams.

Rev. Weaver's last theory is that because of his high managerial position, the knowledge of Elder Williams should be imputed to the church. She relies upon the general proposition that knowledge of its officers and agents is imputed to an entity. She points out that Elder Williams was not a ministerial employee and that in *Iota Mgmt. Corp. v. Boulevard Investment Co.*, 731 S.W.2d 399 (Mo.App.1987), the court permitted imputation to the employer of the supervisor's own actions. In *Iota*, suit was brought for breach of a sales agreement and constructive fraud for nondisclosure of defects in the property. However, as AME counters, *Iota* held "[t]he knowledge of an agent of a corporation *regarding matters within the agent's scope of employment and authority* and to which his employment or authority extends is imputed to the corporate." *Id.* at 410 (emphasis added). AME properly urges that the *Gibson* court held that it is not within the scope of a minister's employment to commit sexual misconduct. *Gibson*, 952 S.W.2d at 246. AME also points to other cases refusing to impute to a corporation the agent's knowledge of his own *unauthorized* act. *Trice v. Lancaster*, 270 S.W.2d 519, 524 (Mo.App.1954); *Southwest Bank of Polk County v. Hughes*, 883 S.W.2d 518, 524 (Mo.App. 1994).

Rev. Weaver claims, however, that in *Pollock v. Wetterau Food Distrib. Group*, 11 S.W.3d 754, 767 (Mo.App.1999), the supervisor's knowledge of his own misconduct (harassment) was imputed to the corporation. Rev. Weaver claims that *Pollock* established that Missouri law now applies strict liability for a supervisor's sexual harassment of an employee even though the employer had no other notice or source of knowledge. What Rev. Weaver does not acknowledge is that the *Pollock* court's holding in an action under the Missouri Human Rights Act [12] was not based on an interpretation of Missouri common law but rather upon an administrative regulation imposing liability "regardless of whether the specific acts complained of were authorized or even forbidden by the employer and regardless of whether the employer knew or should have known of their occurrence." *Id.* at 766 (quoting 8 C.S.R. 60 3.04(17)(c)).[13] There can be no argument that this regulation has any application to an action such as herein, particularly when churches are specifically exempted from coverage under the Missouri Human Rights Act. Section 213.010(7).

We note from our own research that the United States Supreme Court has now created a presumption of vicarious liability in Title VII claims for supervisory acts of sexual harassment subject to an affirmative defense where the employee has suffered no tangible job consequences. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). We have found no case applying

---

**12.** Section 213.010, *et seq.*

**13.** The strict liability language in the regulation was apparently later deleted. See fn. 3, *Pollock*, 11 S.W.3d at 767.

such a liability standard to a common law tort action against a church for sexual harassment, battery or assault by a church minister.[14] The employer in *Pollock* did argue for application of that form of strict liability rather than the type then provided by regulation under the MHRA. The court rejected that request because it was contrary to the state regulation. *Id.* at 767.

 Would the Missouri Supreme Court apply either a common law theory of strict liability or the federal Title VII standard to actions against a church for sexual harassment by its ministers? We do not believe so given the strong statements in *Gibson* requiring inaction by the church in the face of a "known risk" and the concomitant refusal of the court to accept the concept of constructive notice that would apply in a negligent failure to supervise clergy theory. *Gibson*, 952 S.W.2d at 247. We believe that to recover under *Gibson*, the victim must present evidence of actual knowledge by someone at the same managerial level of the wrongdoer. There was no such evidence in this case until the complaint to Bishop Byrd. There was no evidence of a sexual harassment by Elder Williams after that complaint and his subsequent reprimand by Bishop Byrd.

Rev. Weaver also argues a completely different theory. She contends that the known risk that AME ignored was not the risk of another sexual harassment incident, but that its inaction after her complaint to Bishop Byrd allowed Elder Williams to continue to supervise her and ultimately terminate her employment in retaliation for her complaints about sexual harassment. She argues that the harm contemplated in *Gibson* and the damage caused by the supervisor's inaction can be something other than the original damage from the sexual harassment. She contends that harm and damage was her emotional distress from being left in Elder Williams' supervision after her complaint to Bishop Byrd and her subsequent discharge.

 AME responds that *Gibson* does not contemplate that the adequacy or reasonableness of the supervisor's response to a complaint of harm by the clergyman be a separate basis for recovery under the tort of intentional failure to supervise. AME contends that acceptance of this theory would excessively entangle the courts in subjective and civil intrusions into church governance. The church further argues that acceptance of this theory would, under the guise of an intentional tort analysis, permit recovery of damages for Rev. Weaver's discharge from her ministry as being pretextual and retaliatory which it claims would clearly violate the First Amendment and undermine the rationale expressed in *Gibson* for allowing only limited rights of recovery against a church for the unauthorized actions of its clergy. Although we believe that the First Amendment would not necessarily bar any civil court involvement in the issue of the church's response to a complaint, we believe such inquiry does not fall within the concept of the intentional failure to supervise tort recognized in *Gibson*.

One of the theories of relief advanced by the plaintiff in *Gibson* was negligent infliction of emotional distress. Part of that claim involved allegations that the church failed to investigate claims of wrongdoing

14. Our research has revealed at least one decision involving a Title VII claim which held that a "ministerial exception" required by the First Amendment did not completely bar a claim by a former novice against an order of priests for sexual harassment while training to become a priest. *Bollard v. The California Province of the Soc'y of Jesus*, 196 F.3d 940 (1999). There was no discussion about the application of the rule in *Burlington Industries v. Ellerth, id.*

by the priest, covered up the incident and otherwise dismissed or minimized the seriousness of the allegations. *Id.* at 248. In declining to recognize a cause of action for negligent infliction of emotional distress, the court said: "To determine whether the Diocese's responses to its member's claims were 'reasonable,' a court would inevitably judge the reasonableness of religious beliefs, discipline and government. Applying a negligence standard to the actions of the Diocese in dealing with its parishioners offends the First Amendment." *Id.* at 249. We believe that *Gibson* would require the same analysis to be applied to dealings of the church with its clergy, both offender and complainant. Any consideration of whether AME's response to Rev. Weaver's complaint was sufficient, adequate or effective would necessarily involve the applications of principles of reasonableness, i.e., negligence principles. The court in *Gibson* has, we believe, totally rejected the application of such concepts to hiring, retention and supervision of clergy.

To so limit the scope of the tort of intentional failure to supervise clergy does not mean, however, that as a matter of law, there is no other potential theory of recovery which may apply in certain circumstances. *Gibson* also examined plaintiff's allegations that the Diocese tried to cover up the incident and other incidents, failed to investigate their allegations, and treated them poorly after their complaint. The *Gibson* court reasoned that their allegations supported a claim for intentional infliction of emotional distress. The court held that the First Amendment was not offended by allowing such a claim, but that the Gibsons' petition did not satisfactorily plead the additional element of that cause of action, that the conduct is intended only to cause severe emotional harm. Rev. Weaver's petition contained a count for intentional infliction of emotional distress, but that theory was abandoned before sub-

mission of the case to the jury. We render no opinion as to whether her proof did or could have satisfied the elements of such a theory. We do hold, however, that damages flowing only from the nature of the church's response and the type of response made by the church to a complaint are not within the tort of intentional failure to supervise clergy.

## ELDER WILLIAMS' APPEAL

### Was the battery action barred by the statute of limitations?

The jury rendered a verdict against Elder Williams in the amount of $15,000 actual and $1 million punitive damages. Elder Williams raises several separate points on appeal from the judgment entered on the verdict. The claim against Elder Williams was submitted on a battery theory. He contends that the battery claim was barred by the two-year statute of limitations found in § 516.140. Elder Williams further contends that the question of whether the limitation period had run was a question of law and that his motion for judgment notwithstanding the verdict should have been sustained on this ground.

Rev. Weaver responds that the question of when the statute of limitations began to run is, in this case, an issue of fact and not a legal question for de novo review. She points out that the bar of limitations is an affirmative defense and that Elder Williams had the burden of showing, as a matter of law, that the cause of action accrued more than two years prior to the date the petition was filed on June 8, 1998. *Lomax v. Sewell*, 1 S.W.3d 548, 552 (Mo. App.1999). Although she agrees that the battery occurred in 1996, she contends the evidence was equivocal as to when it occurred and there was, thus, a factual issue of when the limitation period began to run.

At the close of Rev. Weaver's evidence, the court initially sustained a motion for directed verdict on the limitations bar ground but then reversed itself and reserved ruling on the issue. At the close of all the evidence, the court denied the motion based on the limitations defense stating:

> My concern was and it still is that there was no evidence presented that I could determine which would allow the court to find that the battery-or the alleged battery occurred at any specific time other than sometime during the year 1996, and I think it is the burden of the defendant to show, if you are going to rely upon the statute of limitations as a defense, to show the applicability of the statute by being able to prove that the date of the alleged battery falls outside the two year filing period, and I don't think that's been done.

Rev. Weaver directs our attention to cases holding that "when contradictory or different conclusions may be drawn from the evidence as to whether the statute of limitations has run, it is a question of fact for the jury to decide." *Id* at 552–53. Elder Williams made repeated attempts to tie Rev. Weaver to a certain date in 1996 on which the battery occurred. She persistently declined saying she was not sure or didn't recall. Elder Williams points to contrary evidence also from Rev. Weaver not as to the exact date but that "it was during the cold season of the year" or that it was "definitely before June 1." Elder Williams contends, based on this evidence that the only conclusion that can be drawn is that the battery occurred before June 8, 1996, and was, therefore, time barred. The problem with this argument is that it misapplies both our standard of review from the denial of judgment notwithstanding the verdict and the burden of proof for the limitation defense. It is not Rev. Weaver's burden to show that her action

was timely filed. Therefore, her claim does not fall for failure to show timeliness because her evidence is equivocal and contradictory in proving the date of the battery. Rather it was the obligation of Elder Williams to show that there was no issue of fact as to the date of the battery so that the issue of whether the limitation period had run could be decided as a matter of law. Secondly, in reviewing the denial of his motion for judgment notwithstanding the verdict, we are required to view the evidence in the light most favorable to Rev. Weaver, giving her the benefit of all reasonable inferences and disregarding inferences to the contrary. *Seitz v. Lemay Bank & Trust Co.*, 959 S.W.2d 458, 461 (Mo. banc 1998). Thus, although it is certainly inferable from the evidence that the battery occurred more than two years before the filing, our standard of review requires us to disregard that inference in evaluating the trial court's ruling on the judgment notwithstanding the verdict.

Consequently, the issue of whether the battery occurred more than two years before the date of filing was one of fact for resolution by the jury under a proper affirmative defense instruction. Inexplicably, Elder Williams failed to offer or request such an instruction. Under the facts herein he therefore waived the factual issue of when the statute of limitations period began to run. *Lomax*, 1 S.W.3d at 553.

### Instructional Error

█ Elder Williams next contends that he should have been granted a new trial because the trial court committed instructional error in two respects. First, he complains that the trial court failed to give the proper instruction as to the burden of proof to recover punitive damages. Specifically, he complains that the burden of proof instruction did not advise the jury that an award of punitive damages must be

supported by "clear and convincing evidence" as required by *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 111 (Mo. banc 1996), and incorporated in M.A.I. 3.01. Clearly the 3.01 instruction given to the jury did not include the punitive damage modification. Elder Williams admits that he made no objection to the burden of proof instructions.

Elder Williams' next claim of instructional error is that the trial court did not give M.A.I. 10.03, which is to be used when considering punitive damages against multiple defendants. The record is clear that the trial court instead gave M.A.I. 10.01 without the modification required by M.A.I. 10.03 that provides "[i]f punitive damages are assessed against more than one defendant, the amounts assessed against each defendant may be the same or they may be different." [15] Again, however, Elder Williams admits that he made no objection to the instructions at the instruction conference.

Elder Williams acknowledges, albeit without citing, the provisions of Rule 70.03 that bar review of instructional error absent objection before the jury retires to consider its verdict. Elder Williams has further violated our procedural rules by failing to include the full text of the complained of instructions in his brief as required by Rule 84.04(e). Nor does Elder Williams seek review of these instructional errors under the doctrine of "plain error" which permits review in our discretion when plain error affecting substantial rights has occurred. *Williams v. Thomas,* 961 S.W.2d 869, 872 (Mo.App.1998). See Rule 84.13(c).

■ Rather, Elder Williams seeks our consideration of these claims of error under the so-called doctrine of "independent review." That doctrine, enunciated in *Bose Corp. v. Consumers Union of the United States, Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) states that:

> in cases raising First Amendment issues ... an appellate court has an obligation 'to make an independent examination of the whole record' in order to make sure 'that the judgment does not constitute a forbidden intrusion on the field of free expression.'

*Id.* at 499, 104 S.Ct. 1949. He argues that such a doctrine should be equally applied in a case involving religious issues under the First Amendment. Regardless of whether such a doctrine would be applied in Missouri, Elder Williams fails to point out how he, individually, has a religious freedom interest in a case of battery by sexual assault.

■ Moreover, we decline to exercise plain error review of these alleged instructional errors. Plain error review is seldom granted in cases of instructional error. *State v. Baker,* 23 S.W.3d 702, 716 (Mo. App.2000). Elder Williams also fails to cite us to any cases involving the application of plain error review to similar instructional error. Similarly, with regard to the failure to make the 10.03 modification, we would find no prejudicial error even if we did exercise plain error review. The jury did, in fact, award punitive damages in separate amounts against each defendant and, in fact, a lesser amount against Elder Williams. We fail to see how he could have been prejudiced. Nor given the proof against Elder Williams, do we find the punitive damage award against him for sexual battery to be excessive or to shock our conscience.

---

**15.** The trial court did correctly give separate 10.01 punitive damages instructions against each defendant. See Notes on Use, M.A.I. 10.03.

## Excessiveness of Punitive Damage Award Against Elder Williams

 Elder Williams in three sentences argues that the award of punitive damages against him was excessive because the ratio of punitive damages to actual damages was 66:1. Elder Williams ignores that there was evidence at trial from which the jury could believe that not only did he commit a battery by grabbing Weaver's breasts but that act was merely the culmination of a long history of far worse verbal and physical sexual harassment by him against Rev. Weaver. The degree of reprehensibility of the defendant's conduct is considered the "the most important indicum" of the reasonableness of a punitive damages award. *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 574, 116 S.Ct. 1589, 1599, 134 L.Ed.2d 809 (1996); *Barnett v. La Societe Anonyme Turbomeca France,* 963 S.W.2d 639, 662 (Mo.App.1997). We have considered the other guidepost for determining the reasonableness and constitutionality of a punitive damage award under *BMW* and *Barnett* and believe they deserve no extended discussion as to the award against Elder Williams. We determine that Elder Williams is not entitled to a new trial and that there exists no legitimate basis for a remittitur by the trial court or this court of the punitive damage award against him.

The judgment is affirmed as to Elder Williams. As to AME the judgment is reversed with directions to enter a judgment in favor of the Church.

LOWENSTEIN and SMART, JJ., concur.