**John DOE AP, Plaintiff/Appellant,**

v.

**ROMAN CATHOLIC ARCHDIOCESE OF ST. LOUIS, et al., Defendants/Respondents.**

**No. ED 94720.**

Missouri Court of Appeals, Eastern District, Division Four.

July 5, 2011.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 22, 2011.

Application for Transfer Denied Oct. 4, 2011.

Mary S. Carlson, Kenneth M. Chakes, St. Louis, MO, Rebecca M. Randles, Kansas City, MO, Patrick W. Noaker, St. Paul, MN, for Appellant.

Edward M. Goldenhersh, Bernard C. Huger, Kirsten M. Ahmad, St. Louis, MO, for Respondent.

ROBERT G. DOWD, JR., Judge.

John Doe AP ("John Doe") appeals from the trial court's grant of summary judgment in favor of the Roman Catholic Archdiocese of St. Louis ("the Archdiocese"), Father Thomas Cooper ("Cooper"), and Archbishop Raymond Burke [1] ("Archbishop Burke"). John Doe contends the trial court erred in granting summary judgment in favor of the Archdiocese on his claim for intentional failure to supervise clergy because the trial court interpreted *Gibson v. Brewer*, 952 S.W.2d 239 (Mo. banc 1997) incorrectly: (1) by including a premises requirement for the acts of sexual abuse, and (2) by finding the sexual abuse did not occur on premises. John Doe also argues the trial court erred in granting the Archdiocese's motion to dismiss his claims for negligent failure to supervise children because the trial court interpreted *Gibson*, incorrectly: (1) in finding negligence in the supervision of a child requires an examination of the standard of care of a priest, and (2) in finding the First Amendment barred judicial consideration of whether the Archdiocese complied with generally applicable tort rules that apply to all employers. We affirm.

John Doe was born on September 24, 1957. John Doe was a parishioner at a Catholic Church in St. Louis, Missouri, where Cooper was a Catholic priest. While John Doe attended the church, Cooper worked with, mentored, and counseled him. From approximately 1970 to 1971, when John Doe was still a minor, Cooper sexually abused him on two separate occasions. The acts of sexual abuse, which included oral sex and attempted anal sex, all occurred at Cooper's clubhouse on the Big River.

---

1. Archbishop Burke was sued only in his representative capacity as Archbishop of the Archdiocese.

The abuse caused John Doe to experience depression and emotional problems. However, John Doe never told anyone of his experience until he revealed it to his psychologist in 2002, at the age of 45.

John Doe filed his petition on June 22, 2005, which included the following counts: (I) child sexual abuse and/or battery against all Defendants; (II) breach of fiduciary duty against all Defendants; (III) fiduciary fraud and conspiracy to commit fiduciary fraud against all Defendants; (IV) fraud and conspiracy to commit fraud against all Defendants; (V) intentional infliction of emotional distress against the Archdiocese and Archbishop Burke; (VI) intentional infliction of emotional distress against Cooper; (VII) negligence against all Defendants; (VIII) vicarious liability (respondeat superior) against the Archdiocese and Archbishop Burke; (IX) negligent supervision, retention, and failure to warn against the Archdiocese and Archbishop Burke; and (X) intentional failure to supervise clergy against the Archdiocese and Archbishop Burke.

The Archdiocese filed an answer and asserted Count X failed to state a claim upon which relief could be granted and was barred by the statute of limitations and laches. The Archdiocese also filed a motion to dismiss counts I, II, III, IV, V, VII, VIII, IX for failure to state a claim upon which relief can be granted. The trial court granted the Archdiocese's motion and dismissed counts I, II, III, IV, V, VII, VIII, and IX.

Defendant Cooper died on December 24, 2003, and John Doe dismissed without prejudice his claims against Defendant Cooper, which included counts I, II, III, IV, VI, and VII.

The Archdiocese also filed a motion for summary judgment on count X, John Doe's sole remaining claim of intentional failure to supervise clergy, arguing John Doe could not prove the alleged acts of sexual abuse occurred on property owned or controlled by the Archdiocese or while Cooper was using the Archdiocese's chattel. The Archdiocese also contended it was entitled to summary judgment because John Doe's claim was time-barred by the statute of limitations. John Doe filed a response, arguing the abuse included "seduction and grooming," which took place on church property prior to the sex acts themselves and that the statute of limitations was tolled until May of 2002 when John Doe's repressed memories of the abuse returned to him. John Doe contends as a result the Archdiocese was not entitled to summary judgment.

The trial court granted the Archdiocese' motion for summary judgment, finding John Doe could not prove the Archdiocese possessed the premises on which he was allegedly sexually abused by its priest. However, the trial court did not grant summary judgment on the basis of the statute of limitations, finding that different conclusions could be drawn from the evidence, and thus, it was a question for a jury. This appeal follows.

The propriety of summary judgment is purely an issue of law. *Meramec Valley R–III School Dist. v. City of Eureka*, 281 S.W.3d 827, 835 (Mo.App. E.D.2009). Accordingly, the standard of review on appeal regarding summary judgment is no different from that which should be employed by the trial court to determine the propriety of sustaining the motion initially. *Id.* Summary judgment is designed to permit the trial court to enter judgment, without delay, where the moving party has demonstrated its right to judgment as a matter of law. *Id.*

Our review of the grant of summary judgment is *de novo*. *Id.* Summary judgment is upheld on appeal if the movant is entitled to judgment as a matter of law and no genuine issues of material fact ex-

ist. *Id.* The record is reviewed in the light most favorable to the party against whom judgment was entered, according that party all reasonable inferences that may be drawn from the record. *Meramec Valley R–III School Dist.,* 281 S.W.3d at 835. Facts contained in affidavits or otherwise in support of a party's motion are accepted as true unless contradicted by the non-moving party's response to the summary judgment motion. *Id.* A defending party may establish a right to judgment as a matter of law by showing any one of the following: (1) facts that negate any one of the elements of the claimant's cause of action; (2) the non-movant, after an adequate period of discovery, has not and will not be able to produce evidence sufficient to allow the trier of fact to find the existence of any one of the claimant's elements; or (3) there is no genuine dispute as to the existence of each of the facts necessary to support the movant's properly-pleaded affirmative defense. *Id.* Once the movant has established a right to judgment as a matter of law, the non-movant must demonstrate that one or more of the material facts asserted by the movant as not in dispute is, in fact, genuinely disputed. *Id.* The non-moving party may not rely on mere allegations and denials of the pleadings, but must use affidavits, depositions, answers to interrogatories, or admissions on file to demonstrate the existence of a genuine issue for trial. *Id.*

Because John Doe's first two points concern the premises requirement of a claim for intentional failure to supervise clergy, we will address them together. In his first point, John Doe argues the trial court erred in granting summary judgment on his claim for intentional failure to supervise clergy because the trial court interpreted *Gibson v. Brewer,* 952 S.W.2d 239 (Mo. banc 1997) incorrectly by including a premises requirement for the acts of sexual abuse. John Doe contends an intentional failure to supervise clergy concerns the

individual priest, not the premises. In his second point, John Doe argues the trial court erred in granting summary judgment on his claim for intentional failure to supervise clergy because the trial court interpreted *Gibson* incorrectly in finding the sexual abuse did not occur on premises in that the predicate acts of grooming took place on church property and were a pattern of the abuse and should not have been separately considered. We disagree.

In *Gibson,* the Supreme Court held a cause of action for intentional failure to supervise clergy is stated if (1) a supervisor exists (2) the supervisor knew that harm was certain or substantially certain to result, (3) the supervisor disregarded this known risk, (4) the supervisor's inaction caused damage, and (5) the other requirements of the Restatement (Second) of Torts, section 317 are met. *Gibson,* 952 S.W.2d at 248. Section 317 of the Restatement (Second) of Torts provides:

A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if

(a) the servant

(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or

(ii) is using a chattel of the master, and

(b) the master

(i) knows or has reason to know that he has the ability to control his servant, and

(ii) knows or should know of the necessity and opportunity for exercising such control.

The failure to meet one of these five elements is fatal to John Doe's claim for intentional failure to supervise.

■ The Archdiocese cites the fifth factor, which consists of a number of factors in Section 317 of the Restatement (Second) of Torts. In particular, Section 317 requires that the servant be upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or is using a chattel of the master. In this case, the Archdiocese contends Cooper, the servant, was not on the premises of the Archdiocese and was not using its chattel when the abuse occurred.

John Doe maintains that allowing Cooper to take children off the Archdiocese's premises alone in the face of its knowledge that he had in the past engaged in sexual abuse with children is sufficient for liability to attach. John Doe contends the Archdiocese could have prevented Cooper from taking children on outings and trips, but it failed to do so and this failure to supervise occurred on its premises.

However, the elements of a claim for intentional failure to supervise are spelled out in *Gibson* as noted above and they include the incorporation of Section 317 Restatement (Second) of Torts. Thus, the Archdiocese was only under a duty to control Cooper when he was on its premises or when he was using its chattel. There is no evidence Cooper met either of these conditions when the abused occurred.

In *Weaver v. African Methodist Episcopal Church, Inc.*, 54 S.W.3d 575, 578 (Mo. App. W.D.2001), a minister filed a claim for, among other things, intentional failure to supervise clergy against the African Methodist Episcopal Church ("AMEC") after she was sexually harassed and groped by three church elders in the lobby of the church. AMEC contended it did not own the church where the groping occurred, but the court found AMEC clearly "possessed" the church and further that the elder in question was privileged to enter the property only as the servant of AMEC, the master. *Id.* at 583. Thus, the court found the plaintiff sufficiently satisfied the premises elements of Section 317. *Id.*

The court in *Weaver* also noted a master's duty under Section 317 is applicable only when the servant is acting outside the course and scope of his employment. *Id.* at 582. This may be because the servant is not performing the work of his employer at the time of the act or at the time he commits an intentional tort which, by definition, is not done in his role as the master's agent but rather solely for his own purposes. *Id.* The limitations expressed in Section 317(a)(i) are intended to restrict the master's liability for a servant's intentional acts outside the course and scope of employment to situations where either the master has some degree of control of the premises where the act occurred or where the master, because of the employment relationship, has placed the servant in a position to obtain access to some premises that are not controlled by the master. *Weaver,* 54 S.W.3d at 582. Such limitations serve to restrict the master's liability for a servant's purely personal conduct which has no relationship to the servant's employment and the master's ability to control the servant's conduct or prevent harm. *Id.* at 582–83.

Further, comment b to Section 317 notes:

the master as such is under no peculiar duty to control the conduct of his servant while he is outside of the master's premises, unless the servant is at the time using a chattel entrusted to him as servant. Thus, a factory owner is required to exercise his authority as master to prevent his servants, while in the factory yard during the lunch hour, from indulging in games involving an unrea-

sonable risk of harm to persons outside the factory premises. He is not required, however, to exercise any control over the actions of his employees while on the public streets or in a neighboring restaurant during the lunch interval, even though the fact that they are his servants may give him the power to control their actions by threatening to dismiss them from his employment if they persist.

Restatement (Second) Torts, Section 317, comment b.

In a case from Pennsylvania somewhat similar to the instant case, a church was held liable for sexual assault under § 317 where the priest gained access to the teenage parishioner's hotel room for the purpose of providing counseling. *Hutchison v. Luddy*, 560 Pa. 51, 742 A.2d 1052, 1062 (1999).

Thus, the fifth element of a claim for intentional failure to supervise under Gibson requires John Doe to show the Archdiocese owned, controlled, had a right to occupy or control the location where the abuse occurred, or had some right to control the activity which occurs thereon. In this case, all of the sexual abuse occurred at Cooper's clubhouse. John Doe even states in his brief that oral sex, masturbation, and attempted anal sex occurred "off church property." John Doe also testified nothing ever happened to him sexually at the parish school, in the church, in the rectory or the priest's living room, and that the only two instances of sexual abuse occurred at the clubhouse. John Doe also testified his trips to the clubhouse were not sponsored by the parish and that un-

like in *Hutchison*, when he was at the clubhouse he did not seek or receive religious training, mentoring, or counseling. Thus, John Doe admits the oral sex, masturbation, and attempted anal sex were not committed on premises possessed by the Archdiocese. We also note there is no evidence in the record showing the Archdiocese owned, controlled, had a right to occupy or control the clubhouse or anything that happened there.[2] As a result, John Doe fails to state an adequate claim for intentional failure to supervise.

However, John Doe argues Cooper, while on church property, engaged in "grooming" to set up a situation where the sexual abuse could happen. We note there is no evidence in the record that any sexual abuse occurred on church premises. The so-called "grooming" cited by John Doe does not qualify as sexual abuse, and, as such, does not satisfy the fifth requirement of a claim for intentional failure to supervise, which requires the sexual abuse to occur on property possessed by the church. John Doe contends the sexual abuse is inseparable from the grooming. We note first that the record is silent regarding specific acts of "grooming," as differentiated from mere friendly behavior, that may have occurred on church property, but, in any case, it is undisputed that the sexualization of the relationship and the acts of abuse only occurred at the clubhouse. Further, we can find no authority that conflates so-called "grooming" with sexual abuse. Thus, we find the alleged "grooming" in this case does not suffice to meet the premises requirement

---

**2.** We note John Doe asserts "[t]he Archdiocese expects its priests to be on duty 24/7." However, in finding the Archdiocese's insurance policy did not provide coverage for injuries a police officer sustained while trying to remove a priest from a protest at an abortion clinic, the court noted the fact that the priest

was a priest 24 hours a day does not make the Archdiocese responsible for all his activities, and does not make any and all of the activities and actions of the priest within the scope of his respective duties. *Maryland Cas. Co. v. Huger*, 728 S.W.2d 574, 582 (Mo.App. E.D. 1987)

of a claim for intentional failure to supervise.

John Doe also argues the Archdiocese has a general duty to avoid creating an unreasonable and foreseeable risk of harm to its children. In support of his theory, John Doe relies on *Snowbarger v. Tri–County Electric Cooperative*, 793 S.W.2d 348, 350 (Mo. banc 1990), which involved an appeal by an employee's widow for benefits under the Workers Compensation Act where an employee, after working 86 hours in a 100.5 hour time period during an emergency created by an ice storm, fell asleep while driving and crashed into another vehicle, killing the employee. The Supreme Court held that the facts before it satisfied an exception to the requirement of Section 287.020.5 that workers be "engaged in or about the premises where their duties are being performed or where their services require their presence as a part of such service," but did not address whether the employer had any duty to the woman injured when the employee collided with her after falling asleep. *Id.* Thus, we do not find the case to be helpful to John Doe here.

■ John Doe also relies on *Berga v. Archway Kitchen and Bath, Inc.*, 926 S.W.2d 476, 477 (Mo.App. E.D.1996), which involved a negligence claim brought against an employer, where its employee was driving home after being exposed to noxious fumes at work and collided with plaintiff's son's car. In that case, the court found after analyzing Restatement (Second) of Torts Section 317 and *Snowbarger*, that the law did not support imposing a

duty on employer. *Id.* at 482. Thus, the *Berga* case is not supportive of John Doe's argument here. In addition, it is distinguishable because it involved a negligent supervision case as opposed to an intentional failure to supervise claim. We can find no Missouri case supporting the imposition of a general duty to avoid creating an unreasonable and foreseeable risk of harm in an action for intentional failure to supervise.[3]

Therefore, we find the trial court did not err in granting summary judgment on John Doe's claim for intentional failure to supervise clergy. Point denied.

Because John Doe's third and fourth points both involve claims that are based on a theory of negligence, we will address them together. In his third point, John Doe argues the trial court erred in granting the Archdiocese's motion to dismiss his claims for negligent failure to supervise children because the trial court interpreted *Gibson* incorrectly in finding negligence in the supervision of a child requires an examination of the standard of care of a priest in that *Smith v. Archbishop of St. Louis*, 632 S.W.2d 516 (Mo.App.1982) and its progeny establish the Archdiocese owed a duty of care to John Doe commensurate with the foreseeable risks to which he was exposed. In his fourth point, John Doe argues the trial court erred in dismissing his negligence claims based on *Gibson* because neither the Free Exercise Clause nor the Establishment Clause of the First Amendment bars judicial consideration of whether the Archdiocese complied with

---

**3.** The cases John Doe relies on from other jurisdictions, namely *Robertson v. LeMaster*, 171 W.Va. 607, 301 S.E.2d 563 (1983), *Faverty v. McDonald's Restaurants of Oregon, Inc.*, 133 Or.App. 514, 892 P.2d 703 (1995), and *Fazzolari v. Portland School Dist. No. 1J*. 303 Or. 1, 734 P.2d 1326 (1987), all rely on a theory of negligent supervision. In *Gibson*, the court found applying a negligence standard to the actions of a Diocese in dealing with its parishioners offended the First Amendment. 952 S.W.2d at 248. Thus, we cannot impose a duty under a theory of negligence here, and we can find no case involving an intentional failure to supervise that has relied on the imposition of a general duty to avoid creating an unreasonable and foreseeable risk of harm.

generally applicable tort rules that apply to all employers. We disagree.

Appellate review of a trial court's grant of a motion to dismiss is de novo. *Stahlman v. Mayberry,* 297 S.W.3d 113, 115 (Mo.App. E.D.2009). We accept as true all of the plaintiffs averments and view the allegations in the light most favorable to the plaintiff. *Id.* We review the petition in an almost academic manner to determine if the facts alleged meet the elements of a recognized cause of action or of a cause that might be adopted in that case. *Id.*

John Doe filed two negligence claims: Count VII for general negligence and Count IX for negligent supervision, retention, and failure to warn. The latter claim involved only a negligent failure to supervise Cooper, not a negligent failure to supervise children, which is John Doe's claim in his third point. Therefore, because John Doe did not plead negligent failure to supervise children in Count IX, his argument with respect to Count IX is meritless.

■ In addition, while John Doe attempts to phrase his claim as a negligent failure to supervise children, his claim for general negligence in Count VII still involves the Archdiocese's negligence in failing to supervise Cooper. The Supreme Court has held questions of hiring, ordaining, and retaining clergy, necessarily involve interpretation of religious doctrine, policy, and administration, and such excessive entanglement between church and state has the effect of inhibiting religion, in violation of the First Amendment. *Gibson v. Brewer,* 952 S.W.2d 239, 246–47 (Mo.

banc 1997). Further, adjudicating the reasonableness of a church's supervision of a cleric—what the church "should know"—requires inquiry into religious doctrine. *Id.* at 247. Thus, Missouri courts have declined to recognize a cause of action for negligent failure to supervise clergy.[4] *Id.*

Although some federal courts [5] diverge on the issue of whether the religion clauses in the First Amendment bar plaintiffs from asserting certain negligence claims against religious institutions, those decisions do not authoritatively compel us to revisit a First Amendment analysis already conducted by the Supreme Court of Missouri in *Gibson. Doe v. Roman Catholic Diocese of St. Louis,* 311 S.W.3d 818, 824 (Mo.App. E.D.2010). Such decisions merely inform us that other courts disagree as to the application of First Amendment law to the facts at bar. *Id.*

The holding in *Gibson,* which was that the First Amendment barred the assertion of tort claims against a religious institution based on its alleged negligence in supervising, retaining, or hiring sexually abusive clerics, has recently been reaffirmed as the controlling law in Missouri. *See Nicholson v. Roman Catholic Archdiocese of St. Louis,* 311 S.W.3d 825, 827 (Mo.App. E.D. 2010) *and Doe,* 311 S.W.3d at 824. Until the Missouri Supreme Court or the United States Supreme Court declares differently, *Gibson* constitutes controlling law in Missouri, law which we are bound to apply. *Doe,* 311 S.W.3d at 824.

Therefore, the trial court did not err in granting the Archdiocese's motion to dis-

---

4. John Doe relies on *Smith, By and Through Smith v. Archbishop of St. Louis* on behalf of Archdiocese of St. Louis, (Mo.App.E.D.1982). While that case involved negligent supervision, it did not involve negligent supervision of a member of the clergy, and thus, it did not involve any First Amendment entanglement. The current case is distinguishable because

the negligent supervision claim involves the Archdiocese's supervision of one of its priests, which implicates the First Amendment as discussed above.

5. *See Mary Doe SD v. The Salvation Army,* 2007 WL 2757119 (E.D.Mo.2007) *and Perry v. Johnston,* 641 F.3d 953 (8th Cir.2011).

miss John Doe's claims for negligent failure to supervise. Point denied.

The judgment of the trial court is affirmed.

ROY L. RICHTER, P.J. and LUCY D. RAUCH, SP.J., concur.