v.

CATHOLIC DIOCESE OF KANSAS CITY–ST. JOSEPH, et al., Respondents.

No. WD 76025.

Missouri Court of Appeals, Western District.

Nov. 12, 2013.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 24, 2013.

Application for Transfer Denied Feb. 25, 2014.

Rebecca M. Randles, Sarah A. Brown, and Dan Curry, Kansas City, MO, for Appellant.

Jonathan R. Haden, Mara H. Cohara, and Chad E. Blomberg, Kansas City, MO, for Respondents.

Before Division II: MARK D. PFEIFFER, Presiding Judge, and JOSEPH M. ELLIS and VICTOR C. HOWARD, Judges.

MARK D. PFEIFFER, Presiding Judge.

The question presented in this appeal is whether the supervisory hierarchy of a religious organization is to be treated differently under the law when it knows that sexual predator-related harm is certain or substantially certain to occur to child parishioners by a member of the clergy it supervises, but in one instance the harm happens to be perpetrated on church property, and in the other instance the harm happens to be perpetrated off of church property. Pursuant to controlling Missouri Supreme Court precedent, the answer appears to be "yes."

D.T.[1] appeals the judgment of the Circuit Court of Jackson County, Missouri ("trial court"), dismissing his cause of action against Respondents the Catholic Diocese of Kansas City–St. Joseph and Bishop Robert W. Finn (collectively, "the Diocese") and Father Michael Tierney ("Tierney").[2] On appeal, D.T. challenges the dismissal of three negligence-based counts and one count of intentional failure to supervise clergy against the Diocese.

## Standard of Review

 This case was decided on motions to dismiss, prior to answer and discovery. Thus, we take as true all facts alleged in D.T.'s petition that was before the trial court. *Sullivan v. Carlisle*, 851 S.W.2d 510, 512 (Mo. banc 1993). "Review of dismissal of a petition allows pleadings their broadest intendment, treats all facts alleged as true, construes all allegations favorably to plaintiff, and determines whether averments invoke principles of substantive law." *Gibson v. Brewer*, 952 S.W.2d 239, 245 (Mo. banc 1997).[3] We review the grant of a trial court's motion to dismiss *de novo*. *Lynch v. Lynch*, 260 S.W.3d 834, 836 (Mo. banc 2008).

## Factual and Procedural Background

Years ago, Father Tierney was placed at the St. Elizabeth's parish in Kansas City by the Diocese to serve as clergy for the St. Elizabeth's parish. D.T. alleges that the Diocese knew that Tierney had sexually molested other child parishioners in the past and, given his ongoing sexual proclivities, knew that it was certain or substantially certain that he would molest other children he would come into contact with. While at St. Elizabeth's parish, he came into contact with child parishioner D.T.

---

1. Initials for the appellant are being used pursuant to section 566.226 RSMo because the appellant alleges that he is a victim of sexual assault and, as such, our ruling endeavors to protect his identity.

2. The trial court actually dismissed all but two counts against Tierney. However, D.T. subsequently dismissed, without prejudice, those remaining counts against Tierney. None of D.T.'s points on appeal alleges error as to the trial court's dismissal of any counts relating to Tierney. Thus, because all points on appeal apply only to Respondents Diocese

and Bishop Finn, Respondent Tierney moved this court for his dismissal from this appeal without objection from D.T.; we granted the motion, dismissing Tierney from this appeal.

3. Acknowledging this precedent, the Diocese states in its brief, "The Diocese vehemently denies [D.T.'s] allegations that it had notice or knowledge of alleged sexual abuse by Tierney, but recognizes that the Court accepts [D.T.'s] pleaded facts as true for purposes of this appeal." Resp. Br. 2.

D.T. grew up in St. Elizabeth's parish in Kansas City. He attended St. Elizabeth's school and served mass as an altar boy at the church, often with Father Tierney. Through the course of D.T.'s time at St. Elizabeth's, Tierney befriended D.T. and his family; Tierney would often approach D.T. at school, place a hand on D.T.'s shoulder, and ask about his family. Tierney began asking D.T. to help him with special projects both inside and outside the parish. One time, for example, Tierney asked D.T. to assist him with an audiovisual presentation at St. Teresa's. Tierney would give D.T. extra attention and would occasionally take him out to eat.

On two occasions in the early 1970's, when D.T. was approximately twelve years old, Father Tierney sexually molested D.T. On each occasion, the sexual molestation was not incident to any parish-related activities. Likewise, on each occasion, the sexual molestation occurred off church property: once in the basement of Tierney's mother's home and another time at a hotel.

D.T. never told anyone what had happened between himself and Father Tierney until June of 2011, when he learned that other boys had accused Tierney of molesting them. D.T. claims that he had repressed or suppressed the memories of his own abuse until that time, and he still does not have a full memory of what occurred, although he is undergoing a process to attempt to recover the memories.

In July of 2011, D.T. sued both Tierney and the Diocese. Both Tierney and the Diocese filed motions to dismiss, claiming that D.T.'s action was barred by the applicable statutes of limitations and also that his petition failed to state a claim upon which relief could be granted. Because D.T. alleged suppressed or repressed memories, the trial court, citing *Powel v. Chaminade College Preparatory, Inc.*, 197

S.W.3d 576, 584 (Mo. banc 2006), refused to dismiss most of the counts on statute-of-limitations grounds. The trial court did, however, grant the Diocese's motion to dismiss all counts for failure to state a claim and, similarly, dismissed all but two counts against Tierney. D.T. then voluntarily dismissed, without prejudice, the two remaining counts against Tierney. D.T. timely appealed.

## Analysis

### *The Seminal Case: Gibson v. Brewer*

In *Gibson v. Brewer*, 952 S.W.2d 239 (Mo. banc 1997), our Supreme Court analyzed a similar fact pattern in which a minor child parishioner alleged sexual abuse by a member of the Diocese's clergy and, in so doing, asserted negligence and intentional torts against the Diocese. In *Gibson*, our Supreme Court analyzed the parameters upon which negligence and intentional torts may or may not be properly asserted against a religious organization for the conduct of its clergy.

With regard to the difference between negligence-based torts against the Diocese versus intentional torts, the *Gibson* court expressed the following neutrality guideline:

> Religious organizations are not immune from civil liability for the acts of their clergy. If neutral principles of law can be applied without determining questions of religious doctrine, polity, and practice, then a court may impose liability.

*Id.* at 246 (citation omitted).

The *Gibson* court then addressed the type of negligence claims that were asserted against the Diocese: negligent hiring; negligent ordination; negligent retention; negligent supervision; negligent infliction of emotional distress; and other independent claims of negligence against the Dio-

cese related to its relationship as "master" to its "servant" members of the clergy. In rejecting each of these negligence claims, the *Gibson* court explained:

> Questions of hiring, ordaining, and retaining clergy, however, necessarily involve interpretations of religious doctrine, policy and administration. Such excessive entanglement between church and state has the effect of inhibiting religion, in violation of the First Amendment.

*Id.* at 246–47 (internal citations omitted).

> Adjudicating the reasonableness of a church's supervision of a cleric—what the church "should know"—requires inquiry into religious doctrine.... [T]his would create an excessive entanglement, inhibit religion, and result in the endorsement of one model of supervision.

*Id.* at 247 (internal citations omitted).

> Whether negligence exists in a particular situation depends on whether or not a reasonably prudent person would have anticipated danger and provided against it. In order to determine how a "reasonably prudent Diocese" would act, a court would have to excessively entangle itself in religious doctrine, policy, and administration.

*Id.* at 249–50 (internal citation omitted).

Conversely, the *Gibson* court reasoned that "[r]eligious conduct intended or certain to cause harm need not be tolerated under the First Amendment." *Id.* at 248 (citing *Cantwell v. Connecticut*, 310 U.S. 296, 308, 60 S.Ct. 900, 905, 84 L.Ed. 1213 (1940)). With that backdrop, the Supreme Court outlined the elements of a cause of action for intentional failure to supervise clergy:

> A cause of action for intentional failure to supervise clergy is stated if (1) a supervisor (or supervisors) exists (2) the supervisor (or supervisors) knew that harm was certain or substantially certain to result, (3) the supervisor (or supervisors) disregarded this known risk, (4) the supervisor's inaction caused damage, and (5) *the other requirements of the Restatement (Second) of Torts, section 317 are met.*

*Id.* at 248 (emphasis added).

Section 317 of the Restatement (Second) of Torts (1965) states that a master has a duty to control his servant while the servant is acting outside the scope of employment and prevent him from intentionally harming others if:

(a) the servant

 (i) is upon the *premises in possession of the master* or upon which the servant is privileged to enter only as his servant, or

 (ii) is using a chattel of the master, and

(b) the master

 (i) knows[4] ... that he has the ability to control his servant, and

 (ii) knows ... of the necessity and opportunity for exercising such control.

(Emphasis added.)

■ Missouri's Constitution expressly states that the Missouri Supreme Court

---

4. Any analysis of section 317 is limited to whether the religious organization intentionally (rather than negligently) failed to supervise clergy. The alternate variations of section 317 based in negligence (i.e., "reason to know") cannot be used to support an intentional tort against the religious organization because "the reasonableness of a church's supervision of a cleric—what the church 'should know'—requires inquiry into religious doctrine [in violation of the First Amendment]." *Gibson v. Brewer*, 952 S.W.2d 239, 247–48 (Mo. banc 1997). The Supreme Court discussed, but rejected, section 317 as part of its analysis of the *negligence* claims in *Gibson*. *Id.* at 247. The *Gibson* court only adopted section 317 as applied to an *intentional* tort.

"shall be the highest court in the state" and that its "decisions shall be controlling in all other courts." Mo. Const. art. V, § 2. Thus, this court is "constitutionally bound to follow the most recent controlling decision of the Missouri Supreme Court." *Independence–Nat'l Educ. Ass'n v. Independence Sch. Dist.*, 162 S.W.3d 18, 21 (Mo.App.W.D.2005) (internal quotation omitted). For cases dealing with sexual abuse by members of clergy, the most recent Missouri Supreme Court decision is *Gibson.* Under the lens of *Gibson,* then, we analyze D.T.'s present claims of error as they relate to the trial court's dismissal of the negligent and intentional torts he has alleged against the Diocese.

### Negligence Counts

D.T.'s fourth, fifth, and sixth points on appeal are that the trial court erred in dismissing his negligence counts against the Diocese: negligent infliction of emotional distress; negligent supervision/retention [of Father Tierney]; and negligent failure to supervise children. D.T. argues that the trial court read *Gibson* too broadly in this respect, effectively concluding that *Gibson* barred all negligence actions against religious organizations on First Amendment grounds. While we agree with D.T. that *Gibson* does not bar all conceivable negligence actions against religious organizations,[5] we also agree with the trial court that *Gibson* bars D.T.'s negligence-based claims against the Diocese in this action.

■ First, with regard to D.T.'s claims of negligent infliction of emotional distress and negligent supervision/retention as those claims relate to the Diocese's master-servant relationship with a member of its clergy, *Gibson* has already reviewed these identical claims and rejected them for the reasons previously detailed in our discussion of *Gibson.* We will not, thus, revisit those identical negligence-based claims in this appeal.

■ D.T. alternatively argues that *Gibson* did not prohibit the trial court, nor should it prohibit this court, from deciding his claim against the Diocese for negligent failure to supervise—not clergy—but *children* in its care. As support, D.T. cites *Smith v. Archbishop of St. Louis,* 632 S.W.2d 516 (Mo.App.E.D.1982). In *Smith,* a young girl who was badly burned by a lighted candle on her second-grade teacher's desk at a Catholic school successfully sued the Diocese that ran the school. D.T. takes from this that he should have been allowed to show that the defendant Diocese in this case failed to use ordinary care in his supervision. We disagree for several reasons.

First, as the Eastern District of this court found significant in *Doe v. Roman Catholic Archdiocese of St. Louis,* 347 S.W.3d 588 (Mo.App.E.D.2011) ("*Doe II* "), the negligent actor in *Smith* was not a clergy member but was a lay teacher, who failed to use an ordinary degree of care in supervising her students. *See Doe II,* 347 S.W.3d at 595 n. 4; *Smith,* 632 S.W.2d at 522. By contrast, in this case, D.T.'s claim that the Diocese negligently failed to properly supervise D.T. (the student) is inextricably tied to his claim that the Diocese should have kept Tierney away from *all* children, and *Gibson,* as noted above, refuses to apply a negligence standard to matters involving a religious organization's supervision of its clergy.

---

5. For example, *Gibson* expressly acknowledges that religious organizations could be vulnerable to civil liability for acts of their clergy in situations involving negligent opera-tion of a vehicle or where church property is negligently maintained in a dangerous condition causing injury from an accident. *Gibson,* 952 S.W.2d at 246.

Second, *Gibson,* which post-dates *Smith,* also states that "[a]pplying a negligence standard to the actions of the Diocese in dealing with its *parishioners* offends the First Amendment." 952 S.W.2d at 249 (emphasis added).[6] D.T. urges this court to reconsider this policy, arguing that whether the Diocese failed to properly supervise its children, including D.T., could be decided using only neutral principles of law of general applicability, which would not run afoul of the First Amendment. D.T.'s leading case authority in this assertion is *A.R.H. v. W.H.S.,* 876 S.W.2d 687, 690 (Mo.App.E.D.1994). In *A.R.H.,* a grandmother was sued by her granddaughter for the sexual abuse she suffered at the hands of the grandmother's husband. *Id.* at 689. The court held that, while the grandmother did not have to breach her marital duties to her husband by, for example, warning the children or their mother of her husband's proclivities, she likely

> could have prevented further abuse either by taking steps to ensure that [the granddaughter] remained with her or within her view at all times when she was in her custody or by declining to accept custody and supervision of the children in her home. Neither of these two alternatives would require Grandmother to compromise her duty of loyalty to her husband.

*Id.* at 690.

We find *A.R.H.* distinguishable as there is a significant factual difference between *A.R.H.* and D.T.'s case. That is, while *A.R.H.* noted that the grandmother could have protected the granddaughter by simply not letting her out of her sight, the Diocese cannot realistically monitor all parish children constantly, whether in or out of school, to make sure that they are not alone with priests who have been accused of abuse. For the Diocese to effectively keep children out of harm's way, it would have to approach the problem from the side of supervising *Tierney's* actions;[7] we conclude that *Gibson,* which is binding on this court, precludes this course of action, at least under a negligence standard. The Eastern District of this court has agreed, stating:

> Although some federal courts diverge on the issue of whether the religion clauses in the First Amendment bar plaintiffs from asserting certain negligence claims against religious institutions, those decisions do not authoritatively compel us to revisit a First Amendment analysis already conducted by the Supreme Court of Missouri in *Gibson.* Such decisions merely inform us that other courts disagree as to the application of the First Amendment to the facts at bar.

*Doe II,* 347 S.W.3d at 595 (footnote omitted) (citation omitted). *Doe v. Roman Catholic Archdiocese of St. Louis,* 311 S.W.3d 818 (Mo.App.E.D.2010) ("*Doe I* ") and *Doe II,* which involved much the same argument from the same appellate counsel as appears before this court, both interpreted *Gibson* to bar all negligence claims against the Diocese resulting from the sexual abuse of a minor parishioner by a

---

6. This is not to say that we are concluding that *Gibson* would require a different result in *Smith* if it were decided today. We simply conclude that the two factual scenarios are distinguishable.

7. D.T. argues that the Diocese should have warned parishioners that Tierney had been accused of abuse by others. This course of action could have a host of problems associated with it, such as violating the privacy of other parishioners or violating religious privileges associated with confessions. These issues seem to be among those that *Gibson* seeks to avoid as "excessive entanglement" with religion.

priest.[8] The trial court did not err in dismissing D.T.'s claim for negligent failure to supervise children.

Points IV, V, and VI are denied.

*Intentional Failure to Supervise Clergy*

D.T.'s first three points on appeal all challenge the trial court's dismissal of his claim against the Diocese for intentional failure to supervise clergy, but on different grounds. Although the arguments for each point are distinct, the differences are subtle, and the arguments tend to overlap. Each of the points alleges that the trial court wrongly interpreted *Gibson v. Brewer* in this respect too narrowly, thereby dismissing D.T.'s claim because the acts of sexual abuse did not occur on the premises of the Diocese.

As previously noted, the *Gibson* court concluded that the Diocese, as an employer, could be liable for the torts of its employee priests, even when the priest was acting *outside* of the scope of his employment (i.e., sexual misconduct), if there was a nexus upon which it was fair to hold the Diocese liable. The *Gibson* court found that nexus when the priest was "upon the premises in possession of the [Diocese] or upon which the [priest] is privileged to enter only as [its] servant, or ... is using a chattel of the [Diocese]" when he committed the tortious acts in question, tortious acts that the Diocese's supervisory hierarchy knew were certain to occur or were substantially certain to occur. 952 S.W.2d at 247.

If the employee is acting outside of the course and scope of his employment—and he is when he commits an intentional tort—it makes sense to limit the duty to supervise to situations where it would still be fair to hold the employer responsible for the employee's actions such as when the employee is on the employer's premises or is using its chattel. *See Doe II*, 347 S.W.3d at 592 ("Such limitations serve to restrict the master's liability for a servant's purely personal conduct which has no relationship to the servant's employment and the master's ability to control the servant's conduct or prevent harm.").

Tierney's alleged acts of abusing D.T. occurred while they were at Tierney's mother's house and while they were in a hotel room. The Diocese did not own or have possessory control over either of these locations, and Tierney was not allowed access to the locations solely because of his status as a priest. *Cf. Weaver v. African Methodist Episcopal Church, Inc.*, 54 S.W.3d 575, 583 (Mo.App.W.D. 2001) (while church did not own the building where sexual harassment occurred, it "possessed" the building for an authorized church function, and the offending church elder was privileged to enter the building only as the servant of the church, so church was liable for elder's actions). Tierney would presumably be welcome at his mother's house regardless of his occupation, and similarly he could rent a hotel room absent his status as a priest.[9]

8. D.T. cites an unpublished Magistrate's order from the United States District Court of the Eastern District of Missouri, who reportedly declared that *Gibson* was wrongly decided by our Supreme Court. We are not free to disregard *Gibson* on this basis. *Doe v. Roman Catholic Diocese of St. Louis ("Doe I")*, 311 S.W.3d 818, 823 (Mo.App.E.D.2010) ("Though meriting our respect, decisions of the federal district court and intermediate ap-

pellate courts and decisions of other state courts are not binding on us.").

9. At oral argument, D.T.'s counsel cited three cases from other jurisdictions for the proposition that the premises requirement of section 317 of the RESTATEMENT (SECOND) OF TORTS could be satisfied when the premises were in no way controlled by the employer, but were otherwise "related to" the employment of the

■ D.T.'s first point argues that Tierney's mother's house and the hotel room should be considered Diocese property for purposes of *Gibson* analysis because D.T.'s presence at these locations occurred only because D.T. and his family trusted Tierney as a priest. However, in a virtually identical factual scenario, the Eastern District, in *Doe II*, refused to hold the Diocese liable when all of the abusive acts occurred at the priest's private clubhouse. 347 S.W.3d at 593. Because we similarly conclude that neither Tierney's mother's house nor the hotel may be considered property possessed by the Diocese or property upon which Tierney was privileged to enter only because of his status as a priest with the Diocese, D.T.'s first point is denied.

■ D.T.'s second point on appeal also challenges the dismissal of his claim for intentional failure to supervise clergy and alleges that because the "grooming" activity, whereby Tierney befriended D.T., obtained his trust, and "seduced" him, was conducted primarily on the premises of the Diocese, he satisfies the premises requirement of RESTATEMENT (SECOND) OF TORTS section 317.

D.T.'s counsel made the identical argument unsuccessfully to the Eastern District of this court in *Doe II*, 347 S.W.3d at 593–94. The *Doe II* opinion noted that, in that case, none of the "grooming" activities that occurred on church property constituted sexual abuse or were anything other than "friendly behavior." *Id.* at 593. Similarly, here, Tierney "befriended" D.T. and his family; would approach D.T. at school, put a hand on his shoulder, and ask how his family was doing; would ask D.T. to help him with audio-visual presentations on Diocese property outside of St. Elizabeth's; and, sometimes Tierney would take D.T. out to eat. Absent the subsequent alleged sexual abuse, none of this conduct would be objectionable.

D.T. cites three Missouri cases for his proposition that "'grooming' allows a predator to normalize sexuality for a young child." *Berg v. State (In re the Care & Treatment of Berg)*, 342 S.W.3d 374 (Mo. App.S.D.2011); *Martineau v. State*, 242 S.W.3d 456 (Mo.App.S.D.2007). Both cases mention grooming, but otherwise are inapplicable. The third case D.T. cites, *State v. Naasz*, 142 S.W.3d 869 (Mo.App. S.D.2004), discusses extensively the grooming of the victim, but does so to refute the abuser's assertion that the victim had consented to the sexual relations with her father. None of the cases cited by D.T. in any way supports his claim in Point II that the "grooming" activities, which were otherwise innocent and some of which occurred on property belonging to the Diocese, are inseparable from the ultimate acts of sexual abuse that Tierney committed off of Diocese-controlled property, thus causing the Diocese to be liable for intentional failure to supervise clergy under section 317 of the RESTATEMENT (SECOND) OF TORTS and *Gibson v. Brewer*. Point II is denied.

tortfeasor. *See Frye v. Am. Painting Co.*, 642 N.E.2d 995 (Ind.Ct.App.1994); *Tallahassee Furniture Co. v. Harrison*, 583 So.2d 744 (Fla. Dist.Ct.App.1991); *Coath v. Jones*, 277 Pa.Super. 479, 419 A.2d 1249 (1980). Other than the fact that only one of these cases (*Frye*) analyzes liability under section 317 of the RESTATEMENT (SECOND) OF TORTS, each of these cases is factually distinct from the present case in a significant way: in each case, an employee was present in the home of the tort victim initially solely because of his employment; then the employee later returned to the victim's home where he committed an intentional tort. As stated above, *Tierney's* access to neither his mother's house nor the hotel was in any way facilitated by his status as a priest. Accordingly, these cases are inapposite to the present appeal.

D.T.'s third point on appeal alleges that the trial court improperly dismissed his claim for intentional failure to supervise clergy in that it wrongly interpreted *Gibson* to hold that section 317 of the RESTATEMENT (SECOND) OF TORTS is the *only* mechanism available for finding an employer responsible for the torts of its employee that were committed outside of the scope of the employee's employment. In *Gibson,* as stated earlier, the Missouri Supreme Court held that, although the First Amendment barred negligence-based claims against a religious organization for sexual abuse conducted by one of its clergy, the plaintiff could bring a claim for *intentional* failure to supervise clergy. *Gibson,* 952 S.W.2d at 247–48. *Gibson* permitted the claim against the Diocese as employer, even though the intentional tort committed by the priest was outside of the scope of his employment, noting that the RESTATEMENT (SECOND) OF TORTS, section 317 provided for employer liability where the tort was committed "upon the premises in possession of the master." *Id.* at 247. It made sense for *Gibson* to rely upon section 317, because in *Gibson,* the tortious acts of the priest did, in fact, occur on property belonging to the master, the Diocese.

Of note, however, immediately after declaring the elements of a cause of action for intentional failure to supervise clergy, which included specific reference to meeting "the other requirements of the Restatement (Second) of Torts, section 317," the Supreme Court summarized the basis for the Diocese's liability to its parishioner for the intentional tort of its cleric:

> Here, giving the allegations of the petition their broadest intendment, the [plaintiffs] have alleged that the Diocese knew that harm was certain or substantially certain to result from its failure to supervise [its cleric], and thus have stated a cause of action for intentional failure to supervise clergy.

*Gibson,* 952 S.W.2d at 248.

This summary statement is silent about *where* the harm occurred and, instead, is focused on the knowledge by the Diocese that the harm was certain to occur or substantially certain to occur. Aside from the fact that the *Gibson* court's liability summarization under the theory of intentional failure to supervise clergy is more akin to the American Law Institute's more recent pronouncement of the Restatements (Third) of both Agency and Torts, this liability summarization lends a degree of credence to D.T.'s argument that other alternative mechanisms found in the Restatements of the law of Torts or Agency may support this intentional tort.

D.T. offers as other such mechanisms sections 314A and 315 of the RESTATEMENT (SECOND) OF TORTS. While the Diocese counters that these sections are "negligence provisions" and, therefore, could not possibly support a claim for intentional failure to supervise clergy, we note that section 317, on which *Gibson* did rely, is also stated in terms applicable to negligence actions: "A master is under a duty to exercise *reasonable care* so to control his servant while acting outside the scope of his employment. . . ." Clearly the Supreme Court borrowed a basis for employer liability from a provision applying to negligence actions (section 317) but then superimposed an intent element. Accordingly, the negligence aspect of sections 314A and 315 does not defeat their use. Instead, we note simply that neither of these sections expressly refers to master/servant relationships, instead, basing liability on other special relationships among the parties. We conclude that sections 314A and 315 are not relevant in this case.

D.T. offers another such liability-triggering mechanism in the RESTATEMENT (SECOND) OF AGENCY, section 219 (1958), and, indeed, that section expressly pertains to liability of the master for the torts of its servant. Section 219 states that the master is liable for the torts of its servant when, *inter alia*, the master *intends* the tortious conduct or consequences or when the servant acts with the apparent authority of the master. D.T. argues that the Diocese, as master, intended the consequences of Tierney's conduct toward D.T. because, having been made aware of Tierney's propensities toward children, it knew that the consequences were "substantially certain" to occur.

The Diocese only addresses section 219 of the RESTATEMENT (SECOND) OF AGENCY briefly, dismissing the possibility that it "would somehow make the Diocese liable for Tierney's acts regardless of the premises requirements in Restatement (Second) of Torts [section] 317." Yet section 219 of the RESTATEMENT (SECOND) OF AGENCY expressly applies to employer liability for an employee's tort falling outside of the scope of employment and conspicuously lacks any mention of either section 317 of the RESTATEMENT (SECOND) OF TORTS or any "premises requirements."

More notable is that, subsequent to the *Gibson* decision, the RESTATEMENT (SECOND) OF AGENCY has been superseded by the RESTATEMENT (THIRD) OF AGENCY (2006) and, as to torts involving physical and emotional harm, the RESTATEMENT (SECOND) OF TORTS has been superseded by the RESTATEMENT (THIRD) OF TORTS (2012).

In the Foreword of volume 2 of the RESTATEMENT (THIRD) OF TORTS (2012), the American Law Institute said, in pertinent part:

> With the publication of this volume, the American Law Institute proudly completes Restatement Third of Torts: Liability for Physical and Emotional Harm.... For today, the two volumes [of Restatement (Third) of Torts] now in print restate the core of American tort law.

*Id.* at XIII. In fact, in 2009, the first of the two volumes of RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM, was published by the American Law Institute, and at that time, the Foreword for the first volume noted that the law of liability for intentional physical harm was restated in the first volume and that the RESTATEMENT (THIRD) OF TORTS in the intentional physical harm area "explains the ideas we hold about social duty and responsibility early in the 21st century." *Id.* at XII. Noticeably silent from the RESTATEMENT (THIRD) OF TORTS is any section similar to section 317 requiring that the servant's intentionally harmful act occurs "upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant."

Instead, section 7.05 of the RESTATEMENT (THIRD) OF AGENCY and the comments that follow it are the most relevant to the factual scenario of the present appeal. As with section 317 of the RESTATEMENT (SECOND) OF TORTS, section 7.05 of the RESTATEMENT (THIRD) OF AGENCY expressly deals with negligence actions. The comments and the cases cited in the annotations, however, indicate that this section, along with section 41 of the RESTATEMENT (THIRD) OF TORTS, LIABILITY FOR PHYSICAL AND EMOTIONAL HARM (2012),[10] contemplates at least the

---

**10.** Section 41. Duty to Third Parties Based on Special Relationship with Person Posing Risks

(a) An actor in a special relationship with another owes a duty of reasonable care to third parties with regard to risks posed by

possibility of employer liability in situations factually similar, if not identical, to the case before this court today. And using *Gibson* as a reference, there is no reason that these provisions could not also be applied to the tort of *intentional* failure to supervise clergy. Section 7.05 of the RESTATEMENT (THIRD) OF AGENCY states:

(1) A principal who conducts an activity through an agent is subject to liability for harm to a third party caused by the agent's conduct if the harm was caused by the principal's negligence [or, by extension, intentional acts or omissions] in . . . supervising, or otherwise controlling an agent.

(2) When a principal has a special relationship with another person, the principal owes that person a duty of reasonable care with regard to risks arising out of the relationship, including the risk that agents of the principal will harm the person with whom the principal has such a special relationship.

The comments following section 7.05 mention that "an employer may be subject to liability under this rule for injury caused by tortious conduct of an employee action outside the scope of employment." RESTATEMENT (THIRD) OF AGENCY § 7.05 cmt. b. Yet section 7.05 makes no mention of the "requirement" that the tortious conduct of the employee occur upon the premises in possession of the employer. Instead, while section 7.05 requires "some nexus or causal connection between the principal's negligence [or intentional actions or omissions] in selecting or controlling an actor, the actor's employment or

work, and the harm suffered by the third party," *id.* at cmt. c, the comments following section 7.05 of the RESTATEMENT (THIRD) OF AGENCY make clear that the *focus* of whether the employer should be held liable for the intentional torts of its employees is the foreseeability of the harm that occurs and the employer's ability to control the conduct of the employee. *Id.* at cmt. d.

The Diocese acknowledges the importance of the employer's ability to control the employee and cites *Hills v. Bridgeview Little League Association*, 195 Ill.2d 210, 253 Ill.Dec. 632, 745 N.E.2d 1166 (2000), to support its case. However, we read *Hills* to favor D.T.'s interpretation of the law on this issue and not that of the Diocese. Like the Missouri Supreme Court did in *Gibson*, the Illinois Supreme Court, in *Hills*, uses section 317 of the RESTATEMENT (SECOND) OF TORTS to analyze whether a master (in this case, a little league baseball club acting through the head coach) should be held liable for the intentional torts (assault and battery) of its servants (assistant coaches). *Id.*, 253 Ill.Dec. 632, 745 N.E.2d at 1179. But unlike in *Gibson* or either of the *Doe* cases in Missouri, the analysis in *Hills* did not end with whether the tortious acts occurred on the premises of the master. In fact, in *Hills*, it was conceded that the master (the little league club) did occupy or possess the premises for purposes of section 317. *Id.*, 253 Ill.Dec. 632, 745 N.E.2d at 1183.

Instead, *Hills* contains a great deal of analysis of the foreseeability [11] of the tor-

---

the other that rise within the scope of the relationship.

(b) Special relationships giving rise to the duty provided in Subsection (a) include:
(1) a parent with dependent children,
(2) a custodian with those in its custody,

(3) an employer with employees when the employment facilitates the employee's causing harm to third parties, and
(4) a mental-health professional with patients.

11. Of course, since *Hills* is deciding whether the club *negligently* failed to supervise the assistant coaches under section 317 of the

tious conduct of the assistant coaches and the club's ability to control the assistant coaches' actions. The opinion stresses that "because no one from [the club] was aware of any violent propensities on the part of [the assistant coach], there is no means by which [the club] could have known of the need to control [the assistant coach]." *Id.*, 253 Ill.Dec. 632, 745 N.E.2d at 1182 n. 3. By contrast, D.T. has alleged that the Diocese "had actual notice that ... Tierney had a propensity to engage in improper and sexualized touching of children through actual reports to employees of the Diocese at or before the events in question, through institutional knowledge and through information gleaned through conversation with the children in the care of the Diocese."

After discussing foreseeability, the *Hills* opinion goes on to state how, as unpaid volunteers, the assistant coaches were likely performing their duties for their own reasons and were, therefore, not likely to be readily subject to *control* by the master (the club). *Id.*, 253 Ill.Dec. 632, 745 N.E.2d at 1185. For example, the club could not control the assistant coaches by threatening to discipline or fire them, and no other plausible means of control had been suggested. The Diocese argues that, similarly, it had no way of controlling Father Tierney when he was not on church property. This argument flies in the face of the nature of a priest's relationship to, and supervision by, his Diocese. A Diocese enjoys a unique control over its employees—it tells its priests where they will live and with whom. It tells them where they will work, and what work specifically the priests will perform within the parish. It would be difficult to imagine what employer could have any more control over its employees, even when "off duty," than a Catholic Diocese. In sum, *Hills* is in no way similar to this case with respect to the master's ability to control the servant, and, for that reason, *Hills* does not support the Diocese's position; in fact, it supports D.T.'s position. D.T. has alleged facts showing that the Diocese both knew that harm was certain or substantially certain to result, and that the Diocese had the ability to control the employee priest to prevent D.T.'s abuse but intentionally refused to do so.

Yet in *Gibson*, our Supreme Court did not announce the elements of intentional failure to supervise clergy, particularly the element incorporating by reference the section 317 requirements from the RESTATEMENT (SECOND) OF TORTS, as "flexible" elements. The elements were declared by the Supreme Court as mandatory elements. *Gibson*, 952 S.W.2d at 248 ("A cause of action for intentional failure to supervise clergy is stated *if* [each element has been alleged].") (emphasis added). And, as stated previously, one of the "requirements" of section 317 is that the servant

[i]s upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or ... is using a chattel of the master.

Here, simply put, this section 317 "requirement" has not been met. The servant's (i.e., Tierney's) harm perpetrated upon D.T. occurred on premises that were

RESTATEMENT (SECOND) OF TORTS, the standard used was whether the club reasonably should have known of a need to supervise or control the assistant coaches. *Hills v. Bridgeview Little League Assoc.*, 195 Ill.2d 210, 253 Ill.Dec. 632, 745 N.E.2d 1166, 1180 (2000). D.T. has alleged intentional failure to supervise clergy, which would, according to *Gibson*, require a showing that the Diocese, as supervisor, "knew that harm was certain or substantially certain to result" but that the Diocese "disregarded this known risk" and that the Diocese's "inaction caused damage." *Gibson*, 952 S.W.2d at 248.

not in possession of the master (i.e., the Diocese) or upon which Tierney was privileged to enter only as the Diocese's servant; likewise, Tierney has not been alleged by D.T. to have used a chattel of the Diocese at the time of perpetrating harm upon D.T. As the Eastern District of this court stated in *Doe II* under a similar fact pattern:

> [T]he elements of a claim for intentional failure to supervise are spelled out in *Gibson* as noted above and they include the incorporation of Section 317 Restatement (Second) of Torts. Thus, the Archdiocese was only under a duty to control [its cleric] when he was on its premises or when he was using its chattel. There is no evidence [the Archdiocese's cleric] met either of these conditions when the abuse occurred.
>
> . . . .
>
> ... As a result, [the plaintiff] fails to state an adequate claim for intentional failure to supervise.

*Doe II*, 347 S.W.3d at 592–93.

Taken to its extreme, then, a religious organization could be fully cognizant that a member of its clergy, when placed near children, is certain or substantially certain to sexually molest children; but as long as it counsels its clergy to take their personal criminal proclivities to premises not owned, possessed, or controlled by the church and not to use a chattel of the church in the commission of the harmful and often criminal actions, there could be no civil liability for intentional failure to supervise.

That result seems to contradict the spirit and intent of the intentional tort recognized and announced by the *Gibson* court. Yet as the precedent of *Gibson* is worded, we are not inclined to disagree with our sister court from the Eastern District in *Doe II*. Simply put, our Supreme Court has announced a very specific number of elements that must be satisfied in order to establish the tort of intentional failure to supervise clergy. Pursuant to the mandate of the Missouri Constitution, once the elements of this cause of action have been announced by the Missouri Supreme Court, only that court may modify the elements.[12]

Perhaps this is a case that our Supreme Court may wish to accept on transfer to clarify application of the elements of the tort of intentional failure to supervise clergy that it previously announced in *Gibson*, particularly in light of the fact that both the Restatements (Second) of Agency and Torts have been revised since *Gibson* was decided. Since the *Gibson* court found persuasive an application of the RESTATEMENT (SECOND) OF TORTS as an element of the tort of intentional failure to supervise clergy, perhaps the Supreme Court will find it equally persuasive that the authors of the RESTATEMENT (THIRD) OF TORTS have consciously chosen to remove any provision similar to section 317 of the RESTATEMENT (SECOND) OF TORTS in their pronouncement of the RESTATEMENT (THIRD) OF TORTS. Given the constraints of the Missouri Constitution, however, this court is not at liberty to modify the elements of the tort of intentional failure to supervise clergy, and instead, we must leave that matter to the discretion of our Supreme Court.

Point III is denied.

---

12. And because the Restatements of the Law, as a series of treatises, are not binding precedent upon any court but, rather, constitute the American Law Institute's compilations of law and general statements on what the law is or should be, our Missouri Supreme Court may elect to continue to endorse an outdated and superseded RESTATEMENT (SECOND) OF TORTS, section 317, as one of the required elements of the tort of intentional failure to supervise clergy.

## Conclusion

For the above-stated reasons, we affirm the trial court's judgment dismissing D.T.'s lawsuit against the Diocese and Bishop Finn.

JOSEPH M. ELLIS and VICTOR C. HOWARD, Judges, concur.